## United States *v.* Reed and another.

*(Circuit Court, D. Oregon. September 3, 1886.)*

1. Public Lands—Land, Agricultural or Mineral.
   Notwithstanding there is some measure of gold deposited in a tract of land, it is subject to entry under the homestead law, as agricultural land, if, under the circumstances as they exist, or may reasonably be expected or produced, it is more valuable for agriculture than mining.

2. Same—Right of Way over Homestead.
   The affidavit of an applicant for an entry under the homestead law, that the application is not made "for the use or benefit of any other person," is not contradicted or falsified by the fact that the applicant has already promised to concede a right of way over the premises for a neighborhood road.

3. Same—Affidavit that Land is not Used or Claimed for Mining Purposes.
   The statute only reserves lands on which there are known mines from entry under the homestead law, and admitting that an applicant for an entry under said law may be required to swear that the land in question is not used or claimed for mining purposes, and that if the oath is false the affiant is guilty of perjury, yet his entry is not thereby vitiated.

Suit to Cancel a Patent to Land.
*Lewis L. McArthur*, Dist. Atty., and *B. F. Dowell*, for plaintiff.
*Rufus Mallory*, for defendants.

Deady, J. On April 4, 1883, the district attorney commenced this suit on behalf of the United States against the defendants, Carlos D. Reed and George E. Eccles, to set aside a patent issued to the former for the N. E. ¼ of the N. W. ¼ of section 31, in township 37 S.,

of range 2 W. of the Wallamet meridian, and situate in Jackson county, Oregon. The patent was issued on a homestead entry made on September 2, 1880, under section 2289 of the Revised Statutes, and commuted, for cash, on April 26, 1881, under section 2301 of said Statutes. The bill alleges that the land was and is mineral, and not agricultural, and is, and was at the date of such entry, more valuable for mining than agricultural purposes, to the knowledge of the patentee, and was therefore not subject to entry as a homestead; and also that the defendant Reed agreed with certain persons who were squatted on the lands to make them deeds for some small portions thereof, when he obtained his patent, including their cabins and gardens, provided they did not make him any trouble in the land-office.

The testimony was taken in the form of depositions before notaries at Jacksonville. It is quite voluminous and contradictory. That of the plaintiff is largely irrelevant and immaterial, while much of it is written in almost colorless ink, so that it has really been a grievous task to read it.

Briefly, the facts are: The premises are situate about a mile west of Jacksonville, in the forks of Jackson creek. For 20 years from the fall of 1851 the bed, lateral gulches, and immediate banks of this creek and its tributaries within said section 31 were mined more or less for gold. During the first half of this period the yield was generally good, and in some instances very great. The mining ground in and on the three forks of this creek within this 40 acres was very rich. It was worked over early in the 50's, and was afterwards worked over and over, first by white men, and then by Chinese, prior to 1878, when it was considered worked out and abandoned.

The defendant Reed has been a miner and farmer in that vicinity for more than 25 years. In 1878 he bought of a squatter, for $250, a small house, garden, and orchard, in the north-east corner of the tract, and moved on the same with his family, where he has resided ever since, engaged in improving the property, and making a home there, by clearing the ground, making fences, building, planting grapes, fruit trees, and gardening, and occasionally mining, further up the creek, for money to pay expenses.

On September 2, 1880, Reed applied at the land-office at Roseburg to enter the tract in question as a homestead, and filed with his application the usual "non-mineral affidavit," to the effect that the land was not mineral, but agricultural, and that no portion thereof was being worked or claimed for mining purposes, under the customs and rules of the mining district; and on April 26, 1881, he applied to the register and receiver to commute his homestead entry under section 2301 of the Revised Statutes, and at the same time filed a "non-mineral affidavit" to the same effect as the former one, which application was allowed; and, on making the required proof of residence and cultivation, and the payment of $1.25 an acre therefor, a certificate

of purchase was issued to him, upon which a patent was thereafter issued on March 10, 1883.

At the time Reed settled on the premises, three other persons were occupying small portions thereof as squatters, namely, John Donegan and his wife, Louis Poperick, and Eli Warnack. The Donegans lived in a cabin on the north edge of the tract, with one or two acres inclosed, and used for an orchard and garden, and had been there most of the time since 1872; the husband being engaged in blacksmithing, and the wife in washing. Louis Poperick had a little 12x14 cabin about the center of the tract, spoken of in the testimony as a "chicken-coop," with a bit of garden near by, where he had lived since 1874, and at one time claimed and worked some mining ground on the tract. On January 8, 1878, Poperick and Donegan jointly leased to a Chinaman named Wong Goon, in consideration of $110 in hand paid, for 15 years, two placer mining claims, 100 yards square each, and lying on the south-west side of the right-hand fork of Jackson creek, and on this tract of land; and thereafter Poperick never mined on the premises, but worked a claim further up the creek. The lease, as is well understood, was in effect a sale; and the transaction was put in that form because the Chinese, not being entitled to become citizens of the United States, could not hold mining ground in their own right. Within two years thereafter, and before the entry of Reed, the Chinese abandoned the claims as worthless. Eli Warnack had a house, and less than an acre of ground inclosed, near the forks of the creek. Before commuting his entry, and making his final proof, Reed told these parties, in effect, that if they did not make him any trouble about his patent he would, after the same was issued, give them their several possessions.

Early in the year 1882 one William Moody and Edmond and David Curtis formed a partnership to work over the old dirt in the bed of the right-hand fork of the creek, and applied to Reed for permission to do so, which he gave them. After working a couple of seasons without success, they abandoned the enterprise, and Edmond Curtis, who furnished the money to carry it on, returned to his home in Indiana.

Early in 1882 one James P. Goodall, an old wandering, visionary miner, and out-of-door pauper, of Jackson county, sent affidavits to the commissioner of the general land-office tending to show the mineral character of the land in question; whereupon the commissioner, under date of February 21, 1882, wrote to the register and receiver, authorizing an investigation of the question, which was had; the affidavits used therein being taken before a notary at Jacksonville, among which were Donegan's, Poperick's, and Goodall's, to the mineral character of the land. On November 14, 1882, the register and receiver reported to the commissioner that Goodall had failed to prove his allegation; and, no appeal being taken from their action, the commissioner, on January 11, 1883, wrote the register and re-

ceiver that their decision had become final, and the land was thereby "adjudged non-mineral in its character," and the patent was issued accordingly.

Pending the controversy, in the fall of 1882, Goodall undertook to locate a mining claim on the left-hand fork of the creek, near the north-west corner of the tract, and did some work in opening or repairing ditches, but took out no gold. After the patent was issued, Goodall wrote to an agent of the general land-office at Roseburg, reiterating the charge that the land was mineral, and hence this suit.

Before the patent was issued Warnack turned over his house to Patrick Ryan on a debt he owed him, with the understanding that Reed would relinquish to him the land contained in the inclosure— about seven-eighths of an acre—when the patent issued, which he did in consideration of one dollar. Reed, however, refused to make any conveyance to Poperick or the Donegans, because they did not keep their word, but, as witnesses and otherwise, made him trouble and expense in his contest with Goodall; and because in the mean time Donegan and his wife had separated, and each claimed the conveyance to the exclusion of the other. Meanwhile, on August 8, 1883, the defendant George Eccles purchased the property, including a lot of household furniture, of Donegan for $150.

The land in question is generally high and rolling, with some low, level patches on the creek. Much of it is covered with a heavy growth of young timber. The soil is a reddish, sandy loam, and is well adapted to fruit raising. Reed never attempted to do any mining on the ground. At the commencement of this suit the improvements of the defendant Reed were worth about $1,200, and consisted of an inclosure of about two acres, containing a substantial dwelling-house and out-buildings, and an orchard of about 140 trees, including the apple, pear, plum, and peach, most of which are bearing fruit of a good size and quality, and some of which are six to ten inches in diameter; two acres, inclosed with a good fence, in which are planted several hundred grape vines; and a field of eight or ten acres grubbed, and fenced with 3,000 rails, made at an average distance of three-fourths of a mile from the place, to clear which was worth not less than $20 per acre. In 1885 this field was plowed and sown to oats.

The proceeding before the register and receiver between Goodall and Reed was set up in the answer as a bar to this suit, and excepted to by the plaintiff for impertinence. The exception was allowed on the ground that the United States was not a party to the proceeding, and therefore not bound by the result. See *U. S.* v. *Minor,* 114 U. S. 233; S. C. 5 Sup. Ct. Rep. 836. And as to the authority of the commissioner to institute such a proceeding, see *Smith* v. *Ewing,* 23 Fed. Rep. 741.

No land is subject to entry as a homestead unless it is subject to pre-emption, (Rev. St. § 2289;) and no "lands on which are situ-

ated any known salines or mines" are subject to pre-emption, (Rev. St. § 2258.) And see Rev. St. § 2302. A patent issued on a pre-emption or homestead entry for land on which any known salines or mines are situated is void, (*Morton* v. *Nebraska*, 21 Wall. 674,) and a suit in equity can be maintained by the United States to cancel the the same, (*McLaughlin* v. *U. S.*, 107 U. S. 526; S. C. 2 Sup. Ct. Rep. 802.)

The nature and extent of the deposit of precious metals which will make a tract of land "mineral" or constitute a "mine" thereon, within the meaning of the statute, has not been judicially determined. Attention is called to the question in *McLaughlin* v. *U. S.*, *supra*, 528, but no opinion is expressed. The land department appears to have adopted a rule that if the land is worth more for agriculture than mining, it is not mineral land, although it may contain some measure of gold or silver; and the bill in this case is drawn on that theory of the law. In my judgment this is the only practicable rule of decision that can be applied to the subject. Nor can account be taken, in the application of this rule, of profits that would or might result from mining under other and more favorable conditions and circumstances than those which actually exist, or may be produced or expected in the ordinary course of such a pursuit or adventure on the land in question. For instance, it appears that the water-shed of Jackson creek is limited, and the volume of water therein comparatively small. Some of the witnesses are of the opinion that the whole 40 acres might be profitably mined if an unlimited supply of water could be procured for that purpose.

But in determining the question of whether the land is mineral or not, such contingencies, possibilities, or even probabilities, cannot be considered. Practically they are no part of the case. The only water that can be taken into the account, as a means of working this land for gold, is the water of Jackson creek, and that has never been sufficient for mining on any part of the premises, except in the bed of the stream, and the gulches and banks near by, when the deposit was comparatively heavy; and even then for only a portion of the year. This ground has been well known and prospected by miners for 35 years, and, if there was any gold left in it that could be obtained in paying quantities by any reasonable means, it would have been taken out long ago. The very fact that no one has ever attempted to get any water on the ground in addition to what flows through Jackson creek is a convincing circumstance to show that it cannot be done, or that the gold in the ground in not worth the venture. Indeed, a glance at the plat of the public survey will show that the only running water within a mile of the ground is Walker creek, a small stream to the northward, which the evidence tends to show was long since appropriated to the use of the Willow Creek mines, some miles to the north of Jacksonville.

The truth is, the mines on and about this ground were practically

worked out long since; and the land has no appreciable value, except for agricultural purposes. Occasionally some one who prefers to gamble on the chance of finding a nugget to a fair day's wages for an honest day's work, may be found loitering about the old cabins, and working wistfully among the *debris* of former washings, in the vain hope of finding an easy living, if not a fortune. I suppose there are thousands of acres of land in southern Oregon and northern California in the same condition, and the sooner it is understood that it is open to the occupation of the farmer the better it will be for the country. Forty acres of this land, cleared and planted in vegetables, vines, and fruit trees, furnishing a permanent home and sure support for an industrious farmer and his growing family, is worth more to the state, in a social and economic point of view, than all the mining or gold on the creek, twice told. On such foundations, rather than the vagrancy and uncertainty of mining for the precious metals, social order and good government are most surely built and sustained.

An effort was made in the evidence to show that there are lodes of gold-bearing quartz on this land, but the proof fell far short of the mark. It does appear that there was some quartz rock near this ground which was pretty thoroughly tested for gold many years ago, and abandoned as non-paying, and the machinery used in the process hauled away.

My conclusion on this branch of the case is that at the time of Reed's settlement on and entry of the land there were no mines thereon, within the meaning of the statute, and that the land was therefore agricultural, and subject to entry under the homestead act. Neither do I find that the land, or any portion thereof, was then actually being mined, or claimed for mining purposes, by any one. And if this were otherwise, the mere fact of such work or claim was not sufficient to withdraw the land from entry under the homestead law, if the land was not in fact mineral,—was worth more for agriculture than mining. True, the oath required of the settler by the land department contains the averment that no portion of the land is claimed or used for mining purposes. But this can only be justified as a cross-examination of the settler, for the purpose of ascertaining the material and ultimate fact of whether the land is actually mineral or not. The statute does not reserve any land from entry as a homestead, simply because some one is foolish or visionary enough to claim or work some portion of it as mineral ground, without any reference to the fact of whether there are any paying mines on it or not. Nothing short of *known mines* on the land, capable, under ordinary circumstances, of being worked at a profit, as compared with any gain or benefit that may be derived therefrom when entered under the homestead law, is sufficient to prevent such entry. Mere mineral prospect or hope, however pleasing or auspicious, shall not keep the land from the plow or the pruning-hook, and it is well that it does not.

If the settler should swear falsely in the matter of the land being claimed or worked for the precious metals, he might, if the question is a proper one to be asked under the circumstances, be punished for perjury; but, in the absence of any statute giving it that effect, such falsehood would not vitiate his entry, nor render his patent void or liable to cancellation.

The affidavit of the applicant for a homestead entry must contain the averment that such entry is not made "for the use or benefit of any other person." There is no allegation in the bill that Reed made this affidavit, but it may be inferred that he did from the facts stated, and the nature of the transaction; and doubtless he did. The arrangement with the squatters, Donegan, Poperick, and Warnack, was subsequent to the affidavit, and before proving up. There is no reason, then, to doubt the truth of the affidavit, or that the entry was made for the sole use and benefit of the affiant. But these squatters had no right on the premises, as against the United States, or any one claiming under any law thereof. The land was open to homestead entry, and the fact that these people were squatted about on it did not prevent any one who was qualified, and saw fit to purchase it from the United States, from becoming the owner thereof, and evicting them as trespassers. But Reed was aware that some portion of the tract had once been mineral land, and he might naturally suppose that these people, when they found they were liable to lose their holdings, would try to make him trouble in the land-office. To avoid this, and, as I think, out of sympathy for them, he assured them that if they did not make him trouble he would give them their little holdings, not amounting to five acres altogether, at the price he paid for it; not that he knew it was mineral land, and was trying to buy their silence, but for fear that they might put him to the trouble and expense of proving that it was not, as was subsequently done before the land-office, and is now being done here again. Indeed, this matter is comparatively of such little significance or value that it might be summarily dismissed, on the maxim *de minimis non curat lex*.

Along with this matter is another, which cuts a considerable figure in the evidence in the case. At the time the arrangement was made with Donegan, Reed promised to allow certain other parties a way across his homestead, to an adjoining piece of land they were about to purchase from Donegan. Reed, it appears, is still willing to give the right of way in a certain place, while they insist on the road running in front of his house, which will destroy his little yard. These parties are men of means and position in that community, and the evidence tends to show that they are behind this suit, and have employed private counsel to conduct it, for the purpose of crushing Reed into submission to their demands, or punishing him for refusal, by making the land cost him much more than it is worth. Which of the parties is in the right of this matter I do not care to inquire. The county court of Jackson county is the proper tribunal to settle

the location of the road, if the parties cannot agree about it. But I cannot refrain from saying, in passing, that it seems an unworthy use of the great name of the United States that private parties should be allowed to maintain a suit therein to cancel the patent of an industrious settler, who, by the sweat of his brow, has made this mineral waste "to bud and blossom like the rose," because he will not yield them a particular roadway across his land, even if he had ever promised to do so. Nor do I think an agreement or understanding with a neighbor for a roadway over a homestead conflicts with the affidavit of the applicant that the same is taken for his "exclusive use and benefit." Every one holds his property subject to such easements; and an applicant for a homestead may certainly come to an agreement on the subject with those interested before making his entry, without laying himself liable to the imputation that he is falsely entering land in his own name for the use and benefit of another. Indeed, congress has expressly declared (Rev. St. § 2288) that an applicant or occupant under the pre-emption or homestead law may convey a right of way for a railway across the pre-emption or homestead without thereby vitiating his right to perfect his title. And doubtless it should be held that an agreement for any public or private way, to be laid out over it, is within the equity of this statute.

There is no equity in the bill, and it must be dismissed; and I only regret that I cannot give the defendant a decree for costs and disbursements.