[Civil No. 530.   Filed May 15, 1897.]

[48 Pac. 904.]

CHARLES BLACKBURN et al., Defendants and Appellants, v. THE UNITED STATES OF AMERICA, Plaintiff and Appellee.

1. PUBLIC LANDS— PRE-EMPTION — PATENT — CANCELLATION — KNOWN MINERALS—MINES AND MINING—REV. STATS. U. S. SEC. 2258, CONSTRUED.—Under section 2258, *supra,* the existence of salines or minerals must be known at the time of entry to defeat a patent acquired under the Pre-emption Act. A suit to cancel a patent issued under a pre-emption cash entry cannot be sustained where the evidence fails to show that any known mineral deposit of any value existed on the land in question at the date of entry, though it does appear that the land contains some mineral which has proven unprofitable to work.

2. SAME—SAME—SAME—SAME—PLEADING—IN BAR—LACHES.—A plea in bar of the lapse of time from the entry of the land to the time of the institution of a suit by the United States to cancel a pre-emption patent, showing that suit was commenced twelve years after the cause of action accrued, and that during that time innocent purchasers acquired interests in the land, should be sustained.

APPEAL from a judgment of the District Court of the Fourth Judicial District.in and for the County of Yavapai. A. C. Baker, Judge. Reversed.

The facts are stated in the opinion.

Johnston & Sloan, for Appellants.

The evidence fails to show that there were any known mines before or at the time of entry and issuance of patent in 1878 upon the patented lands.

A known mine is thus defined in *Colorado C. and I. Co.* v. *United States,* 123 U. S. 190 (Co-op. Ed.) : "It is not sufficient in our opinion to constitute 'known mines' of coal within the meaning of the statute that there should be merely indications of coal-beds or coal-fields of greater or less extent and greater or less value as shown by outcroppings. We hold therefore that to constitute the exemption contemplated by the Pre-emption Act under the head of 'known mines,' there

should be upon the lands ascertained coal deposits; of such value and extent as to make the land more valuable to be worked as a coal mine, under the conditions existing at the time, than for merely agricultural purposes.   The circumstance that there are surface indications of the existence of veins of coal does not constitute a mine, or does not even prove that the land will be ever, under any conditions, sufficiently valuable on account of its coal deposits to be worked as a mine.   A change in the conditions occurring subsequently to the sale, whereby new discoveries are made, or by means whereof it may become profitable to work the vein as mines, cannot affect the title as it passed at the time of the sale." See, also, defining "known mines" *United States* v. *Reed,* 28 Fed. 486; *Deffeback* v. *Hawke,* 115 U. S. 426, 6 Sup. Ct. Rep. 95.

Entry was made and patent issued in 1878.   This suit was commenced in 1890.   Therefore, the claim is stale, and the plaintiff has been guilty of laches, and a court of equity for that reason will refuse to cancel the patent.   See *United States* v. *Flint,* 4 Saw. 60, Fed. Cas. No. 15,121; *United States* v. *Beebe,* 17 Fed. 26; *United States* v. *Beebe,* 127 U. S. 338, 8 Sup. Ct. Rep. 1083; *Badger* v. *Badger,* 69 U. S. 838; *March* v. *Whitmore,* 88 U. S. 485; *Hayward* v. *Bank,* 96 U. S. 85; *Twin Lick C. Co.* v. *Marburg,* 91 U. S. 328.

In *United States* v. *White,* 17 Fed. 565, the court says: "Although statutes of limitation do not run against the government, yet the staleness of the claim may be taken into consideration in determining whether a court of equity should interfere and grant relief where the United States as well as a natural person is a plaintiff.   When the United States comes into a court of equity as a suitor, it is subject to the defenses peculiar to that court." *United States* v. *Tichenor,* 8 Saw. 156, 12 Fed. 449; *United States* v. *Flint,* 4 Saw. 58, Fed. Cas. No. 15,121; *Stearns* v. *Page,* 7 How. 829. "Under the state law this suit, if between private parties alone, would be barred within three years." *Manning* v. *San Jacinto Tin Co.,* 7 Saw. 430, 9 Fed. 726. "Six years elapsed between the issuance of the patent and the filing of the bill, and no averment is made to show that the fraud was not discovered, or by the exercise of ordinary diligence in the land office might not have been discovered immediately after its consummation."

There being no fraud or perjury committed in procurement of patent, as shown by the evidence, and the government having announced that it relied upon lack of jurisdiction, as above stated, in the interior department to issue patent, and there being no tender to defendants of purchase money paid by them, the cancellation of the patent and depriving defendants of their patent was error. The United States and its rights are controlled by the same laws by which those of individuals are governed. *Brent* v. *Bank,* 10 Pet. 554; *United States* v. *White,* 17 Fed. 565; *United States* v. *Budd,* 43 Fed. 634; *United States* v. *Minor,* 114 U. S. 233, 5 Sup. Ct. Rep. 836.

E. E. Ellinwood, United States District Attorney, and E. M. Sanford, for Appellee.

BETHUNE, J.—This is an action on the part of the United States for the cancellation of a patent issued on the fifteenth day of December, 1878, to one of appellants here for a certain tract of government land situated in Yavapai County, under a pre-emption cash entry made by said Blackburn in August of that year, on the grounds "that said land was not agricultural land, and not subject to entry except as mineral land; that the same is, and at the time of said entry was, known to be mineral land; that it has never had any value whatever as agricultural land, and is not susceptible to cultivation"; and "that Blackburn made the pre-emption entry for the fraudulent purpose of procuring a larger amount of mineral land at a smaller price than it could have been purchased for under the mineral land laws." The complaint alleges that one day after the issuance of the patent to Blackburn he conveyed the land to one Mrs. Bean, and that she and her husband knew the land to be more valuable for minerals than for agriculture, and that Blackburn was conveying the land to her in fraud of the rights of the United States. Mrs. Bean kept the land until August, 1889, when she conveyed it to one J. W. Clay, one of the defendants in this action. The record fails to show that the defendants knew of the existence of mineral in any appreciable quantity on the land at the time entry was made by Blackburn, or, in fact, until June 1, 1889, when, it is inferentially admitted by the answer, it

became known that a mine existed upon the land. Several of plaintiff's witnesses testified that they did not know that defendants had any knowledge of the mineral character of the land at the time of Blackburn's entry, and none testified that they did. The evidence relied upon by plaintiff is, in brief: That one William Pierce made a location upon what was the Hassayampa ledge in 1869 or 1870, within the boundaries of the Blackburn entry; that Pierce worked the property down to a depth of fifteen or sixteen feet through quartz which carried galena, and perhaps a little sulphur; that Pierce had abandoned his location before Blackburn's entry; that C. A. Behm, one of the witnesses for plaintiff, had examined ore on the dump, and found it valuable; that the dump was there three years prior to the trial of this case; that he had tried to exploit the mine, and could not do so because of too much water; that he (Behm) worked on the north half of the ledge, and quit work on account of the water; that no one is working there now; that he did not make any money out of it; considered the ore valuable, but did not know how much it was worth, or how much it cost to mine it; that Pierce had a windlass on the Hassayampa ledge, and worked there in 1876-1877, and that in 1878 a man prospecting there would see evidence of abandoned claims; and that, if pumping machinery be put in, and the ledge prospected thoroughly, it would pay; that E. A. Rupert, his father, and brother located the Silver King Mine in 1882 or 1883, and there was at that time a shaft on the mine; that he sorted the ore on the dump, and shipped something over a ton, which brought $182; that he sold the Silver King to the Kansas City Mining and Milling Company, which worked the mine, and then quit it; that prior to the year 1878 one Charles Bishop raised potatoes, cabbages, corn, and other agricultural products on the land, which is a narrow strip up and down the creek, and taking in all there is of the creek bottom; that E. A. Rupert, one of plaintiff's witnesses, at the time he lived on the Silver King Mine,—from 1886 to 1889,—supported a family of from four to eight from the mine. On the part of the defense it was shown that there were different patches of land on the claim in controversy fenced in and cultivated in vegetables prior to 1878; that there were no indications of mines upon the land in 1878, but there were some prospect holes; that since 1878

those who have worked on this land seeking mines have done it at a loss; that since 1878 one of the Ruperts had worked there, and the Kansas City Mining and Milling Company had also worked the mine, but that everybody who had worked the mine found it unprofitable; that Rupert got money out of it by selling to the Kansas City Milling and Mining Company.

No lands upon which are situated any known salines or mines are subject to pre-emptions (Rev. Stats. U. S., sec. 2258), and the existence of such salines or minerals must be known at the time of entry. In the contest of *Cleghorn* v. *Bird,* before the department of the interior, Secretary Lamar said: "It has been repeatedly held by this department that it must appear, not that neighboring or adjoining lands are mineral in character, or that the land in dispute may hereafter possibly develop minerals in such quantity as will establish its mineral character, but that as a present fact it is mineral in character." 4 L. D. Dep. Int. 478. And this view has been adopted by the courts. *United States* v. *Reed,* 28· Fed. 482. From the record before us it is impossible to draw an inference that any known mineral deposit of any value existed on the land in question at the date of Blackburn's entry. It does appear that the land contains some mineral, and that the assay of ore taken from the old Pierce shaft showed sufficient value to indicate that the land might be valuable for mining, provided ore of that value could have been obtained in sufficient quantity, and extracted and worked at a profit. But the evidence on this is conclusive that every one who has worked the mine on this land has found it unprofitable.

We might rest the decision of this case on the branch of it already treated of, but there is another feature raised by the record, and pleaded as a bar to the action,—to wit, the lapse of time from the entry of the land until the institution of this action. We think this plea is well taken. The entry was made by Blackburn in 1878, and this action was brought in the year 1890,—twelve years after the cause of action accrued,—and during which time innocent purchasers acquired interests in the land. "Courts of equity will not entertain a suit to vacate a decree, even in case of palpable frauds, where there has been unnecessary delay in its introduction, and the rights of third parties have intervened in reliance upon the

decree. Consideration of public policy requires prompt action in such cases; and if, by delay in acting, innocent parties have acquired interests, the courts will turn a deaf ear to the complaining party. This is a doctrine of equity irrespective of any statute of limitations, and irrespective of the character of the suitors. It is essential that this doctrine should be vigorously upheld for the repose of titles and the security of property." *United States* v. *Flint,* 4 Saw. 60, Fed. Cas. No. 15,121. "Although statutes of limitation do not run against the government, yet the staleness of the claim may be taken into consideration in determining the question whether a court of equity should interfere and grant relief where the United States as well as a natural person is a plaintiff. When the United States comes into a court of equity as a suitor, it is subject to the defenses peculiar to that court." *United States* v. *White,* 17 Fed. 565; *United States* v. *Tichenor,* 8 Saw. 156, 12 Fed. 449. No doctrine of elementary law is more thoroughly established than this. Our conclusion is, that the bill in this case should have been dismissed. The judgment of the lower court is reversed, with directions to enter judgment for the defendants for their costs in this action.

Rouse, J., concurs.

Hawkins, J., having been of counsel in this case in the court below, took no part in this case in this court.