UNITED STATES of America, Plaintiff,

v.

James W. TOOLE, Peter G. Milohov, Leonora E. Toole, Adele O. Milohov, Susan C. Milohov, Lillian E. Toole, E. W. Boegler, Nicolo Ottolino, and Tracana Enterprises, Inc., Defendants.

Civ. No. 366.

United States District Court
D. Montana,
Billings Division.

Nov. 29, 1963.

Moody Brickett, U. S. Atty., for District of Montana, Butte, Mont., and Richmond F. Allan, Asst. U. S. Atty., Billings, Mont., for plaintiff.

Sandall, Moses & Cavan and John P. Acher, Billings, Mont., for defendants.

JAMESON, District Judge.

This is a civil action brought by the United States to cancel mining claims located on land belonging to the United States, to quiet the title of the United States, and to recover damages for alleged trespass and conversion of materials from the land. The land is located within the Lewis and Clark National Forest, in Judith Basin and Meagher Counties, Montana, and contains approximately 160 acres described as the Northeast Quarter of Section 28, Township 11 North, Range 10 East, Montana Principal Meridian. Jurisdiction is derived from 28 U.S.C.A. § 1345 and is not in dispute.

The defendants' claim is based upon certain placer mining locations, and the

validity of their claim depends upon whether they have discovered material locatable under the mining laws of the United States.

The land contains a meadow area known as Clyde Park. It is a semi-bog area covered with a peaty muck material varying in depth from approximately six to twelve inches. In 1956, Lee Salsbury, a greenhouse owner and operator of Billings, Montana, who was interested in extracting the peat material, took samples and corresponded with Forest Service officials about the possibility of obtaining a lease to remove the material. Eventually he was informed that the Forest Service would not permit any excavation or removal of the peat, although apparently the officials were mistaken as to the area in which Salsbury was interested. James W. Toole, one of the defendants, first learned of the peat material on Clyde Park from Salsbury. Toole was interested in the nursery business, and in 1959 accompanied Salsbury to Clyde Park to examine the material. Samples were taken, and subsequently Toole visited the Billings Office of the Bureau of Land Management, Department of the Interior, to obtain information on mining claim procedures.

In the latter part of 1959, Toole filed five certificates of location of lode mining claims. Counsel for the defendants stipulated that the lode claims are invalid, and no right or interest is predicated upon these claims.

On April 11, 1960, the individual defendants, James W. Toole, Peter G. Milohov, Susan C. Milohov, Leonora E. Toole, Adele O. Milohov, Lillian E. Toole, E. W. Boegler, and Nicolo Ottolino filed a certificate of location of a placer mining claim called the J-W-T Placer Mining Claim. By two quitclaim deeds, executed October 21, 1960, the individual defendants conveyed their interest to the defendant Tracana Enterprises, Inc.

Tracana Enterprises, Inc. was incorporated under the laws of Montana on January 21, 1960, for the purpose of severing, processing and selling materials of the type found on the placer claim.

Sometime prior to March 30, 1960, stripping and removal operations were commenced on the J-W-T placer claim. Two types of materials have been severed and removed—the peaty muck material, described above, and the soil which lies immediately below the muck.

Tracana Enterprises, Inc. operates a plant and warehouse at Harlowton, Montana, and loading and hauling equipment as well as a small hammer mill at the claimsite. The peaty muck material is dried, shredded or hammered, bagged, and sold by Tracana as horticultural "Peat Moss". The soil beneath is crushed or hammered until it is quite fine, then bagged and sold as Tracana "Soluble Mineral", claimed by defendants to be a source of "trace elements" or "micronutrients" beneficial to the development of plant and animal life. The defendants claim that each type of material is "mineral", within the meaning of the mining laws of the United States, and subject to location.

 Generally speaking, deposits of minerals, other than coal, oil, gas, oil shale, sodium, phosphate and potash [1] in lands belonging to the United States are open to exploration and purchase under the act of May 10, 1872, which, with amendments, forms the nucleus of the general mining laws of the United States. 30 U.S.C.A. §§ 21 and 22.[2]

[1]. Minerals belonging to the United States which are excepted from the operation of the general mining laws are acquired under mineral leasing laws. These minerals are not subject to location and purchase, but must be developed under rights obtained from the United States in the form of a license or lease. See §§ 181–194, 201–209, 211–214, 223–229a, 241, 251 and 261–263 of Title 30 U.S.C.A. and 1955 U.S.Code, Cong. and Adm.News, 84th Cong. 1st Sess. p. 2476.

[2]. See 1955 U.S.Code, Cong. and Adm.News, 84th Cong. 1st Sess. pp. 2476 and 2477, for a general discussion of the procedure prescribed in establishing a mining claim.

Section 21 reserves from sale lands valuable for minerals, except as otherwise directed by law. Section 22 provides:

"Except as otherwise provided, *all valuable mineral deposits* in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States." (Emphasis added.)

By virtue of 16 U.S.C.A. § 478, the National Forest lands here in question were subject to mineral entry and the defendants were aware of that fact. 30 U.S.C.A. § 35 authorizes the location of placer claims, as distinguished from lode mining claims.[3]

In Best v. Humboldt Placer Mining Co., 1963, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350, the Supreme Court referred to mining claims as "a unique form of property" and continued: "A mining claim on public lands is a possessory interest in land that is 'mineral in character' and as respects which discovery 'within the limits of the claim' has been made. Cameron v. United States, 252 U. S. 450, 456 [40 S.Ct. 410, 64 L.Ed. 659]. The discovery must be of such a character that 'a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.' Castle v. Womble, 19 L.D. 455, 457; Chrisman v. Miller, 197 U.S. 313, 322 [25 S.Ct. 468, 49 L.Ed. 770]; Cameron v. United States, supra

[252 U.S.], p. 459 [40 S.Ct. p. 412]." (371 U.S. at 335–336, 83 S.Ct. at 382.)

■ Two elements are essential in a valid mining location—first, a "location" by staking the claim, posting notice, and recording in accordance with state laws; and second, a proper discovery of valuable mineral. United States v. Lillibridge, S.D.Calif.1932, 4 F.Supp. 204; see also 1955 U.S.Code, Cong. & Adm. News, p. 2474 et seq. We are concerned in this case with the second element, i. e., whether defendants have discovered a "valuable mineral deposit" rendering the lands open to mineral location and entry.

The difficulty in ascribing a meaning to the word "mineral" in a given statutory context was early recognized in Northern P. R. Co. v. Soderberg, 1903, 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575. There the issue was whether a deposit of granite rendered certain lands "mineral" and as such excepted from a grant of territory from the United States to the plaintiff railroad. The Court said:

"The word 'mineral' is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case. Thus the scientific division of all matter into the animal, vegetable, or mineral kingdom would be absurd as applied to a grant of lands, since all lands belong to the mineral kingdom, and therefore could not be excepted from the grant without being destructive of it. Upon the other hand, a definition which would confine it to the precious metals, gold and silver, would so limit its application as to destroy at once half the value of the exception. Equally subversive of the grant would be the definition of minerals found in the Century Dictionary: as 'any constit-

---

3. 30 U.S.C.A. § 35 provides in part: "Claims usually called 'placers,' including all forms of deposit, excepting veins of quartz, or other rock in place, shall be subject to entry and patent, under like circumstances and conditions, and upon

similar proceedings, as are provided for vein or lode claims; * * * no such location shall include more than twenty acres for each individual claimant; * * *".

uent of the earth's crust;' and that of Bainbridge on Mines: 'All the substances that now form, or which once formed, a part of the solid body of the earth.' Nor do we approximate much more closely to the meaning of the word by treating minerals as substances which are 'mined,' as distinguished from those which are 'quarried,' since many valuable deposits of gold, copper, iron and coal lie upon or near the surface of the earth, and some of the most valuable building stone, such, for instance, as the Caen stone in France, is excavated from mines running far beneath the surface." 188 U.S. at 530, 23 S.Ct. at 367, 47 L.Ed. at 581.

The Court recognized the rule that "the words 'valuable mineral deposits' should be construed as including all lands chiefly valuable for other than agricultural purposes, and particularly as including non-metallic substances, among which are held to be alum, asphaltum, borax, guano, diamonds, gypsum, resin, marble, mica, slate, amber, petroleum, limestone, building stone and coal." 188 U.S. at 534, 23 S.Ct. at 368, 47 L.Ed. at 583.

For purposes of the mining laws, it is generally held that a "mineral" is "whatever is recognized as mineral by the standard authorities on the subject".[4] But only *valuable mineral* is locatable and only lands containing *valuable mineral deposits* are subject to mineral entry. 30 U.S.C.A. §§ 21 and 22, supra.

Courts have held mineral deposits to be locatable when they occur on lands "chiefly valuable" for mining or other than agricultural purposes.[5] But the test most often utilized and best supported in reason is the so-called "prudent investor" test. See Best v. Humboldt Placer Mining Co., supra, and cases there cited. This test requires the mineral to exist in such quantity and quality as to enhance the value of the lands and invite the expenditure of time and labor for their development by a person of ordinary prudence, not necessarily a skilled miner, with a reasonable expectation of success. Chrisman v. Miller, 1905, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770; United States v. Lillibridge, supra; Cataract Gold Mining Co., et al., 1914, 43 L.D. 248.[6]

Mining works have combined the various rules of what constitutes mineral and

**4.** 43 CFR § 185.2; Anchorage Sand & Gravel Co. v. Schubert, D.Alaska 1953, 114 F.Supp. 436, 14 Alaska 403; Pacific Coast Marble Co. v. Northern Pac. R. R. Co., 1897, 25 L.D. 233, 244; King v. Bradford, 1901, 31 L.D. 108; Phifer v. Heaton, 1898, 27 L.D. 57.

**5.** See Northern P. R. Co. v. Soderberg, supra; Webb v. American Asphaltum Mining Co., 8 Cir. 1907, 157 F. 203; United States v. Dawson, 1944, 58 L.D. 670, 679; Pacific Coast Marble Co. v. Northern Pac. R. R. Co., supra, 25 L.D. at 241. Often the test is applied through comparison of the relative value of the lands for agricultural (forest) or mining purposes. See United States v. Reed, C.C.D.Ore.1886, 28 F. 482; United States v. Lillibridge, supra.

**6.** Cataract Gold Mining Co., et al., held that land need not be chiefly valuable for minerals to be open to location. The opinion states:
"As already set out, the intent of the general mining laws was to encourage and promote the development of the mining resources of the United States, and with this fact in mind, a careful review of the laws and of the various decisions of this Department and of the courts appears to support the conclusion that if a mineral claimant is able to show that the land contains mineral of such quantity and value as to warrant a prudent man in the expenditure of his time and money thereupon, in the reasonable expectation of success in developing a paying mine, such lands are disposable only under the mineral laws, notwithstanding the fact that they may possess a possible or probable greater value for agriculture or other purposes. In other words, the mineral deposit must be a 'valuable' one; such a mineral deposit as can probably be worked profitably; for, otherwise, there would be no inducement or incentive for the mineral claimant to remove the minerals from the ground and place the same in the market, the evident intent and purpose of the mining laws." 43 L.D. at 254. See also Castle v. Womble, 1894, 19 L.D. 455.

valuable mineral into an able and workable definition of "valuable mineral deposit" locatable under the United States Mining Laws. It is said:

"The mineral character of the land is established when it is shown to have upon it or within it such a substance as: (a) Is recognized as a mineral, according to its chemical composition, by the standard authorities on the subject, or (b) Is classified as a mineral product in trade or commerce, or (c) Such a substance (other than mere surface which may be used for agricultural purposes) as possesses economic value for use in trade, manufacture, the sciences, or in the mechanical or ornamental arts, * * * and it is demonstrated * * * that such substance exists in the lands in such quantity as would justify a prudent man in expending labor and capital in the effort to obtain it." 1 Lindley, Mines, 3rd ed. 1914, 174–175, § 98, as restated in 2 Amer.Law of Mining 171, § 2.4.

Aside from these rules of inclusion, the Materials Act of July 31, 1947, and its amendments, now 30 U.S.C.A. § 601 et seq., operates to exclude common materials from the operation of the mining laws. Section 601 provides that, "The Secretary (of Agriculture), under such rules and regulations as he may prescribe, may dispose of mineral materials (including *but not limited to* common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders, and clay) and vegetative materials

* * * on public lands of the United States * * *." (Emphasis added.) By § 611 (added by amendment of July 23, 1955) it is provided:

"No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: *Provided, however,* That nothing herein shall affect the validity of any mining location based upon discovery of some other mineral occurring in or in association with such a deposit. 'Common varieties' are (as) used in sections 601, 603, and 611–615 of this title does not include deposits of such materials which are *valuable because the deposit has some property giving it distinct and special value* * * *." (as amended September 28, 1962) (Emphasis added.) [7]

██ ██ The defendants have the burden of proving that the materials in question are valuable mineral deposits. When the Government contests a mining claim it bears only the burden of going forward with sufficient evidence to establish a prima facie case. The burden then "shifts to the claimant to show by a preponderance of the evidence that his claim is valid". Foster v. Seaton, 1959, 106 U.S.App.D.C. 253, 271 F.2d 836, 838.[8] The court continued: "One who has located a claim upon the public domain has,

---

7. Among regulations relating to the Materials Act, 43 CFR § 185.121–(b) provides: " 'Common varieties' as defined by decision of the Department and of the courts, include deposits which, although they may have value for use in trade, manufacture, the sciences, or in the mechanical or ornamental arts do not possess a distinct, special economic value for such use over and above the normal uses of the general run of such deposits. Section 3 (§ 611, Title 30 U.S.C.A.) of the law has no application where the mineral for which a location is made is carried in or borne by one of such common varieties."

8. Accord, Davis v. Wiebbold, 1891, 139 U.S. 507, 11 S.Ct. 628, 35 L.Ed. 238, where the burden to establish the mineral character of the land was placed upon the mineral claimant as to land returned by the Surveyor General as agricultural. See also United States v. Strauss, 1945, 59 I.D. 129.

prior to the discovery of valuable minerals, only 'taken the initial steps in seeking a gratuity from the Government.' Ickes v. Underwood, 78 U.S.App.D.C. 396, 399, 141 F.2d 546, 549, certiorari denied 1944, 323 U.S. 713, 65 S.Ct. 39, 89 L.Ed. 574; Rev.Stat. § 2319 (1875), 30 U.S.C.A. § 23. Until he has fully met the statutory requirements, title to the land remains in the United States."

Have the defendants sustained their burden of showing that (1) the peat or peat moss and (2) the trace minerals are valuable mineral deposits subject to location and entry?

■ The peaty material may be classified as a "sedge" or "sedge reed" peat. It derives its name from the sedge grasses which cover it in place and which make up a substantial portion of its composition. From the evidence it may be said that peat is high in organic matter and is a form of vegetation below that of higher plants. Estimates of the organic content of the peat from the J.W.T. Placer Claim varied greatly among the various witnesses, as did their estimates of its value as a soil conditioner.

The nature of "peat moss" was considered in Premier Peat Moss Corporation v. United States, S.D.N.Y.1956, 147 F. Supp. 169. In holding that peat moss was an agricultural commodity exempted from the permit requirements of 49 U.S. C.A. § 309 by § 303(b) (6), the court said:

"Indubitably peat moss is of vegetable origin. It is 'produced by nature from what was once vegetation, and chemically it is substantially the same as the vegetation from whence it is derived. In fact, its chief characteristic results from the fact that nature itself has arrested any substantial change which without the protection of water would otherwise have taken place. Its principal uses, too, are either agricultural or horticultural.'

"The defendants urge that peat moss is unlike any commodity produced on a farm and is more in the nature of coal. But in the case of coal, although in origin derived from vegetation, the processes of nature have converted it into a mineral. Not so in the case of peat moss. There the processes of decay have not progressed far enough to cause any substantial change in its original chemical content." 147 F.Supp. at 174.

It is true, as defendants contend, that this case in no way involved the interpretation of mining laws. The foregoing excerpts from the case, however, were quoted with approval in United States, Contestant, v. J. W. Shireman, et al., Contestees, Colorado Contest No. 44, decided April 26, 1957. This was an administrative contest in which the contestees claimed that peat is mineral and locatable under the mining laws. The evidence was reviewed in detail and was in many respects similar to that presented here. The opinion of the Acting Director recognized that the issue was "whether the material involved is locatable under the mineral laws" and after discussing various definitions of "mineral" continued:

"However, whatever definition is used, it is inconceivable that the United States Mining Laws, which, except for a few minor amendments, were enacted in 1872 largely as a result of the California gold rush, were intended to apply to any substance which, when located, was primarily vegetable or organic material. To so hold would lead to the absurd result that grasses, plants, shrubs, etc., either growing or dead, could be acquired by location under laws which historically have been applied only to inorganic substances."

The Acting Director concluded that where the natural changes in sedge and other plants comprising the peat in placer

mining claims have not progressed to the point of making the material into predominately nonvegetable and inorganic matter, substances which might properly be considered mineral as in the case of fuel peat, the material involved is not of the character subject to location and purchase under the provisions of the mining laws.

The decision in Shireman also relied upon unreported decisions of the United States District Courts of Colorado and California holding that peat moss is not a mineral within the mining laws of the United States or the laws of those respective states. United States v. Collins, D.Colo.1941, Civil No. 353; United States v. Lawrence, S.D.Calif.1941, Civil No. 648–B.

The fact that United States v. Shireman, supra, is an administrative decision of the Bureau of Land Management does not detract from its authority here. On the contrary, as the Supreme Court points out clearly in Best v. Humboldt Placer Mining Co., supra, this is the type of case where the administrative agency ordinarily is better qualified to determine the relevant issue by reason of its special competence in this field.[9]

Both parties rely upon the Materials Act of 1947, supra, amendments thereto in 1950 and 1955, and the legislative history of the Act and amendments in support of their respective contentions. Defendants argue that while the Materials Act of 1947 removed from the purview of the mining laws certain materials which had theretofore been locatable minerals, peat was not included among these materials. Plaintiff contends that it was unnecessary to exclude peat from the mining laws since peat is a vegetative matter and was never within the purview of the mining laws.

The Materials Act was amended in 1950 to provide that moneys recovered from the disposition of materials from school lands in Alaska should be paid into the territorial school fund (30 U.S.C.A. § 603). The amendment further provided (§ 604) that the Secretary of the Interior "may dispose of sand, stone, gravel, and vegetative materials located below high water mark of navigable waters * * *". When this section was titled for official publication, it was headed "Disposal of sand, peat moss, etc. in Alaska; contracts". This title presently appears in § 604. This is the only specific reference to "peat moss" in the Materials Act or the amendments thereto. While not conclusive, it is some evidence of a congressional intent to equate peat moss with vegetative material. Moreover, even prior to the amendment to the Materials Act of 1947, Alaska was receiving moneys derived from the disposition of minerals and timber lands under the Act of March 4, 1915, 48 U.S.C.A. § 353, relating to public lands in Alaska. The 1950 amendment to the Materials Act was designed to extend these provisions to other materials, including peat moss.[10]

9. The United States had instituted suit to condemn certain property and later instituted a contest proceeding in the local Land Office of the Bureau of Land Management seeking an administrative determination of the validity of the mining claims, alleging that the land embraced in the claims was nonmineral in character and that the minerals had not been found in sufficient quantity to constitute a valid discovery. The claimants sought to enjoin the officials of the Department of the Interior from proceeding with the administrative action. The court of appeals had held that when the United States invoked the jurisdiction of the district court by filing the condemnation action the validity of the mining claims was left to judicial determination. In reversing, the Supreme Court said, "It is difficult to imagine a more appropriate case for invocation of the jurisdiction of an administrative agency for determination of one of the issues involved in a judicial proceeding." The opinion contains an excellent discussion of the "plenary authority" granted the Department "over the administration of public lands, including mineral lands" and its "broad authority to issue regulations concerning them".

10. This is clear from the legislative history of the 1950 amendment, as set forth in

Defendants contend that the subsequent amendment of July 23, 1955, and particularly the addition of section 611, supra,[11] manifests a contrary congressional intent, in that peat was not included among the materials listed in section 611. The purpose of the 1955 amendment was to curb nonmining activities and similar abuses causing waste of surface resources in national forests under color of the mining laws and to give the Secretary of Agriculture the same authority as to land under his jurisdiction as the Secretary of the Interior possessed as to lands under his jurisdiction in the disposition of mining and vegetative materials.[12] This amendment does not militate against the conclusion that peat was considered by Congress to be a vegetative material within the meaning of the Materials Act.

Defendants also rely upon 30 U.S.C.A. § 3, prescribing the duties of the Bureau of Mines. This section provides that it shall be the province and duty of the Bureau of Mines "to conduct inquiries and scientific and technologic investigations concerning mining, and the preparation, treatment, and utilization of mineral substances with a view to improving health conditions, and increasing safety, efficiency, economic development, and conserving resources through the prevention of waste in the mining, quarrying, metallurgical, and other mineral industries; * * * to investigate explosives and peat; * * *." It will be noted that the duty "to investigate explosives and peat" is set apart from the Bureau's duties with respect to "mining", "mineral substances", and "mineral industries". The mere fact that the Bureau of Mines has the duty to investigate explosives and peat does not in itself justify a conclusion that they should be classified as mineral. On the contrary, the fact that they are treated separately in prescribing the duties of the Bureau leads to the conclusion that Congress did not consider them as mineral substances.

Defendants also refer to numerous government publications relating to mineral resources which discuss peat.[13] It is true, as defendants contend, that in many of these articles the discussion was not confined to the use of peat in the fuel industry, but also included its use in agriculture and horticulture. The mere fact that peat has been included in these government publications relating to mining and mineral resources is not sufficient to show that peat is a locatable mineral.

Senate Rep. No. 2255, 1950 U.S.Code Cong.Serv., p. 3526, 81st Cong. 2d Sess., where it is said:

"Under the act of March 4, 1915 (38 Stat. 1214, 48 U.S.C., sec. 353), the Department of the Interior is authorized to sell timber or *to dispose of minerals* from reserved school section lands in Alaska. The proceeds are deposited in the Territorial Treasury as permanent funds, with the income used for school purposes.

"This bill *would extend those provisions to cover revenue from all materials, including gravel and peat moss,* of which there are large quantities in Alaska, located on the survey school sections. The act of July 31, 1947 (61 Stat. 681; 43 U.S.C., sec. 1185) [now 30 U.S.C.A. § 601 et seq.], *permits such disposition of materials* on the public lands of the United States." (Emphasis added.)

See also letter of Secretary of the Interior Chapman, 1950 U.S. Code Cong. Serv., supra, pp. 3526, 3527.

11. This section was further amended on September 28, 1962, Pub.L. 87-713, to include "petrified wood".

12. See annotation with respect to 1955 amendment following 30 U.S.C.A. § 601, and 1955 U.S.Code, Cong. & Adm.News, pp. 2474, 2477, 2480 and 2481.

13. Defendants refer to articles appearing in "Mineral Resources of the United States" for various years (published prior to 1925 by the U. S. Geological Survey, Department of the Interior, and since 1925, by the Bureau of Mines); "Minerals Year Book, Fuels, 1953, Vol. II, a publication of the Department of the Interior; and 1958 and 1959 Census of Mineral Industries, a publication of the Department of Commerce, Bureau of the Census.

As was said in United States v. Shireman, supra, " \* \* \* (I)t is not apparent from the publications that any consideration was given as to what constitutes, from a legal standpoint, a mineral within the meaning of the United States Mining Laws".

Based on the evidence in this case, the statutes and legislative history, and the decided cases, I must conclude that the peat or peat moss in question is not of the character subject to location and purchase under the provisions of the mining laws of the United States.

■ We turn now to the question of whether the material called "Tracana Soluble Mineral" is a valuable mineral locatable under the mining laws, as defendants contend, or a common variety of soil having no property giving it a distinct or special value, as plaintiff contends. Defendants rely upon the presence of "trace elements" in the material, many of which are alleged to be beneficial to plant and animal life. The reports of spectrographic analyses show the constituents of the material to be silicon and aluminum with intermediate trace amounts of the following: calcium, iron, sodium, potassium, magnesium, titanium, barium, strontium, manganese, zirconium, boron, vanadium copper, chromium, lead, gallium, and sometimes nickel and cobalt. Obviously, those substances would be termed mineral by standard authorities. Whether the material is a "locatable" mineral turns upon the factual question of whether trace elements, available and beneficial to plant and animal life, exist in such quantities and in such form as to render the deposit "valuable" within the meaning of the United States mining laws.[14]

In evidence are reports of six samples of soil material examined spectrographically by Smith Emery Company, metallurgical and testing engineers. These samples were taken by Thomas E. Schessler, geologist and valuation engineer for the United States Forest Service, as follows:

I. "JWT–1" (Ex. 7)—shovel sample at claim site, which contained some of the peaty muck material in addition to the Tracana subsoil.

II. "JWT–2" (Ex. 7a)—shovel sample at claim site from near the bottom of the test hole and consisting only of the Tracana subsoil.

III. "JWT–3" (Ex. 7b)—sample of loose subsoil material given to Schessler by Toole.

IV. "JWT–3a" (Ex. 7e)—package of finished Tracana "Soluble Mineral" product as sold to the public, supplied by Toole.

V. "JWT–A" (Ex. 7c)—sample of dirt or soil taken along the roadway near Helena, Montana, for purposes of comparison.

VI. "JWT–B" (Ex. 7d)—sample of dirt or soil taken along roadway near Helena, Montana, for purposes of comparison.

---

14. This was the issue in United States v. Storey, et al., 1960, Idaho Contest No. 010171, Bureau of Land Management, Department of the Interior, where claimants based their mineral location on "rhyolite"—"a very acid volcanic rock, the lava form of granite"—urging that it was useful as a soil conditioner. The opinion contains this statement: "There appears to be no question that if the rhyolite is used solely for fill or base for commercial fertilizer preparations or for addition to soil to make it more friable, it isn't locatable. But if this deposit is of unique or special value over and above the ordinary type of fill materials (sand, crushed stone, humus, etc.), for agricultural purposes because of the 'trace minerals' contained therein, then, in that event it may be a 'valuable mineral deposit' within the meaning of the mining laws and subject to mineral appropriation. Unrebutted testimony of Dr. Bushnell (Dr. Vernon C. Bushnell, who also testified as an expert for plaintiff in this case) convinces us that rhyolite is not valuable for its trace minerals and that the deposit is not a valuable mineral deposit within the meaning of the mining laws."

The following table shows a comparison of the results of the spectrographic analyses of the material taken from the JWT claim with the samples of roadside soil near Helena, Montana:

| Minor constituents expressed in percentage approximately accurate to nearest factor of ten | TRACANA MATERIAL | | | | ROADSIDE SOIL | |
|---|---|---|---|---|---|---|
| | I. | II. | III. | IV. | V. | VI. |
| Constituents | JWT–1 (Ex. 7) | JWT–2 (Ex. 7a) | JWT–3 (Ex. 7b) | JWT–3a (Ex. 7e) | JWT–A (Ex. 7c) | JWT–B (Ex. 7d) |
| Silicon | *Maj.Con. | Maj.Con. | Maj.Con. | Maj.Con. | Maj.Con. | Maj.Con. |
| Aluminum | Maj.Con. | **Int.Con. | Int.Con. | Maj.Con. | Int.Con. | Int.Con. |
| Calcium | Int.Con. | 1% | 1% | 1% | Int.Con. | Int.Con. |
| Sodium | 1% | 1% | 1% | 1% | Int.Con. | 1% |
| Potassium | 1% | 1% | 1% | 0.5% | Int.Con. | Int.Con. |
| Iron | 1% | 1% | 1% | 1% | 1% | 1% |
| Magnesium | 0.5% | 0.1% | 0.1% | 0.5% | 0.5% | 0.5% |
| Titanium | 0.1% | 0.1% | 0.1% | 0.05% | 0.05% | 0.05% |
| Barium | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Strontium | 0.05% | 0.05% | 0.05% | 0.05% | 0.05% | 0.01% |
| Manganese | 0.01% | 0.01% | 0.005% | 0.01% | 0.01% | 0.05% |
| Zirconium | 0.01% | 0.01% | 0.05% | 0.01% | 0.05% | 0.01% |
| Boron | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% |
| Vanadium | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% |
| Copper | 0.005% | 0.005% | 0.005% | 0.01% | 0.005% | 0.01% |
| Chromium | 0.005% | 0.005% | 0.005% | 0.01% | 0.005% | 0.005% |
| Lead | 0.001% | 0.001% | 0.001% | 0.1% | 0.001% | 0.01% |
| Gallium | 0.001% | 0.001% | 0.001% | 0.001% | 0.001% | 0.001% |
| Tungsten | None | None | None | None | None | None |
| Molybdenum | None | None | None | None | None | None |
| Nickel | None | None | None | None | None | None |
| Cobalt | None | None | None | None | None | None |
| Rare Earths | None | None | None | None | None | None |

Schessler and David E. Hintzman, also a geologist and valuation engineer for the Forest Service, testified that they would expect similar reports from a spectrographic analysis of soil from almost anywhere.[15]

Dr. William A. Berg, a soil scientist for the Forest Service, testified that the soil was not unique from a physical standpoint; that micronutrients are present in ordinary soil, and that the soluble mineral content is reduced in soil

\* Major Constituent

\*\* Intermediate Constituent

15. The spectrographic analyses of the material from the JWT claim and of random soil gathered near the roadside in another area for the purpose of comparison show a striking similarity even to the layman.

subject to leaching by water, such as the soil from the JWT claim.

Perhaps the best qualified witness in this area was Dr. Vernon C. Bushnell, soil scientist and chemist employed by the Bureau of Reclamation. Dr. Bushnell analyzed chemically samples of the material from the JWT claim. His conclusions were set forth in a report (Ex. 40), which fairly summarizes most of his testimony at the trial:

"This specimen is a soil-like material of medium to medium heavy texture. Chemically this soil appears to have been derived from a source that is either not readily weathered, or it contains a very small content of elements needed for plant growth. This soil material would be inferior to most good agricultural soils in available potassium, iron and manganese; and it is not better than normal in any other plant nutrient included in these analyses. Tracana is incapable of enriching an agricultural soil and it is capable of being harmful by increasing unwanted clay content and/or diluting nutrients already available."

Dr. Bushnell agreed with Schessler and Hintzman that one could analyze hundreds of ordinary soils and get results similar to those obtained from the analyses of the Tracana material. He testified that the trace minerals were highly insoluble, or about as soluble as "beach sand", so that very little of them would be available to plant life.

Dr. Bushnell did not run any growing tests. He testified that proper tests of this nature are very expensive. He did not consider them necessary in view of the results of the chemical analysis of the soil.

Defendants relied primarily upon the testimony of users of the Tracana material to sustain their burden of showing that the material constituted a valuable mineral deposit. In addition, Dr. Oscar O. Thomas of Montana State College testified that copper, manganese, cobalt and iron are animal nutrients necessary to the development of normal healthy animals. However, he had not run any tests upon defendants' product and was not prepared to testify as to its value or potential in supplying animals with these substances.

Mrs. Iris Erbe, an experienced flower shop and greenhouse operator of Roundup, Montana, used some of the "soluble mineral" material in 1961 in growing corn and tomatoes. The plants so treated were larger and better than any she had previously grown and outclassed corn and tomato plants planted at the same time without the product being added. However, she had never had her test soil analyzed and she considered it a poor soil. John Beck, in a similar business in Billings, used the Tracana material in both potting soil and seed beds with good results, comparable to those obtained when he used other mineral supplement products on the market.

Frank Orchowsky and Robert Burnhart testified that they fed the material to their cattle. The cattle ate it, and Orchowsky's cattle seemed to be in as good a condition as cattle on other supplements. Burnhart noted that "foot rot" in some of his cattle disappeared shortly after he commenced to feed Tracana. He has noted no deficiency in his cattle since he began using the product. The evidence fairly establishes, however, that stock will eat dirt, and chew on various things such as fence posts, etc., when suffering from nutritional deficiency. When that occurs the materials sought out by cattle have no relationship to what they should be eating to remedy the deficiency.

Some of the defendants themselves conducted growing tests.[16] James Toole

16. Dr. Bushnell questioned whether the tests conducted by defendants and their witnesses had been carefully controlled. Illustrating the problems involved in proper control, he stated that water given soils and plants is a source of micronutrients, and that in running tests the soil used must be carefully analyzed, and water, light, temperature, etc., strictly controlled.

testified that corn in a tract planted with Tracana did better than that in a tract planted without the material two weeks earlier. The tracts were some distance apart. Defendants Milohov and Toole tested the material on a sugar beet farm belonging to Leonard Codneys. All three testified that sugar beets grown in soil to which Tracana was added were heavier and relatively free of "black root". Some increase in yield was noted.

Ralph Redi, caretaker at a Billings cemetery, applied some of the material around some trees at the cemetery which were looking bad and turning yellow. He stated that subsequent to the application they "greened up" and looked better.

H. Lee Welsh, an experienced geologist and mining engineer, called by the defendants, testified that the silicon and aluminum, which make up 50% of the material, are not soluble, but he felt that the trace elements responded favorably to solubility tests which he conducted. He predicated his opinion with respect to the value of the material upon its usefulness as a fertilizer due to the presence of potash and glauconite. Mr. Welsh, however, is not an expert in the field of plant nutrition; and Dr. Bushnell testified that those two elements were not present in sufficient quantities to render the material valuable as a fertilizer.

I can see no useful purpose in setting forth further testimony. The well-qualified expert witnesses called by the plaintiff were all definitely of the opinion that the material has no value as a plant nutrient and is incapable of enriching an agricultural soil. On the other hand, many reputable, experienced and disinterested users were honestly and firmly of the opinion that the application of Tracana had been beneficial and resulted in increased productivity.

Assuming, without deciding, that the use of Tracana benefited the soils to which it was applied, there is no substantial evidence to show what produced the beneficial results. Defendants produced no witnesses who had analyzed the product and could say what elements were present in the material which would enrich an agricultural soil or produce beneficial results when fed to animals. In the light of the testimony of the expert witnesses, I must conclude that defendants have failed to sustain their burden of proving that the trace elements in the material constituted "valuable minerals" within the meaning of the mining laws.

Plaintiff seeks substantial damages, contending that defendants were wilful trespassers and converters and accordingly liable for the full value to defendants of the material taken, without deduction for any values added by their labor and capital.

I am convinced from the evidence as a whole that the defendants asserted and operated their claim in good faith. The land was open to mineral entry, and the defendants determined that to be the fact. The material beneath the peat contained many "trace minerals". The trace minerals listed in the Smith Emery Company reports which defendants received, seemed to compare, to the untrained eye, with mineral nutrient products on the market, as far as could be ascertained from their labels. They had been advised by Mr. Welsh that the subsoil material was valuable as a fertilizer by reason of the "abundance of mineral feed".[17] The defendants' own growing tests appeared to them successful. Later there were many satisfied customers to back defendants' belief in the worth of their product. Their attorney advised them that the claim was valid.

17. A report from Welsh dated April 16, 1960, (Ex. 49) concluded as follows: "With the abundance of mineral content shown in the analysis of the soil from this tract and the abundance of plant growth in the form of long stem grass and tall trees, there is no doubt about the abundance of mineral feed being a prime factor in the plant growth. Furthermore the various growers tests of this soil for plant growth are very satisfactory. It has a decided future potential."

It is true that the defendant James W. Toole knew of Salsbury's unsuccessful efforts to obtain a lease from the Forest Service which would permit removal of the peat material, and that he saw a letter to Salsbury from an official of the Forest Service to the effect that the Service would not approve the excavation of the peat. It is true also that Forest Service officials opposed defendants' operations and posted notices at the claim site, telling defendants to suspend operations and warning that further operations would be regarded as a trespass.

On April 21, 1960, shortly after the notices were posted, Thomas E. Schessler, geologist and mineral examiner for the Forest Service, made an examination of the claim, taking the soil samples referred to above, two of which were given to him by Toole. Schessler testified that he took the samples according to Toole's direction. Toole testified that this examination was made at Toole's request. Plaintiff ordered testimony to the effect that the examination would have been made routinely in the absence of any request, but I must accept as true Toole's statement that he did in fact request the examination.

 Toole testified further that he understood that a report of the results of Schessler's examination would be made available to the defendants. The Forest Service, however, simply notified the defendants by letter that as a result of the mineral examination the Forest Service was of the opinion that the material would not support a mineral claim.[18] It is clear accordingly that defendants had notice that their claim was disputed. On the other hand, they were convinced by the advice from their own attorney that the claim was locatable. The mere fact that the Forest Service took a contrary position is not in itself sufficient to establish bad faith.[19]

Defendants also contacted Dale Johnson, an attorney for the Bureau of Land Management,[20] and told him of the notice. Toole testified that he understood Johnson told him that defendants could continue operations pending an administrative contest. Johnson's recollection was that he had not stated that operations could be continued, but might have told Toole that he could expect an administrative contest if the Forest Service thought the claim was invalid. Johnson said further that he may have told defendants how much assessment work was necessary to be done on the claim. Defendant Milohov came away from the discussion with the impression that they had to continue working the claim in order to "prove up" on it.

Certainly defendants could reasonably have anticipated an administrative contest.[21] Such a contest was not only pos-

18. In this action, shortly before trial, defendants sought the production of reports Schessler and Hintzman had prepared with respect to the material taken from the JWT claim. Plaintiff objected to the production of the reports, and following a hearing in advance of trial, at which Hintzman and others testified, the court sustained the objection. Yet later the same afternoon or the following morning, while testifying as a witness for the plaintiff, Hintzman referred extensively to the same reports to refresh his recollection. It is not surprising that defendants were unable to appreciate the reluctance of plaintiff to permit them to have these reports in advance of trial.

19. See Delta Drilling Co. v. Arnett, 6 Cir. 1950, 186 F.2d 481, 486, where the court said: "The notice received by the defendants * * * was a mere notice of controversy, not amounting to notice of actual facts establishing the existence of a willful trespass, as was the case in Guffey v. Smith, 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856."

20. In locating their claim, the defendants had received assistance and cooperation from the Bureau of Land Management in complying with mining location procedures. They were referred to the Bureau by Forest Service personnel when they requested information on forest mining regulations.

21. Under an administrative contest, the losing party may appeal the examiner's decision to the Director of the Bureau (43 CFR 1962 Supp. § 221.1), from him to the Secretary of the Interior (Id. § 221.-31), and then to the courts. Foster v. Seaton, 1959, 106 U.S.App.D.C. 253,

sible, but also the normal and better practice. See Best v. Humboldt Placer Mining Co., supra.[22] Instead plaintiff instituted this action in December, 1961, some 21 months after the notices had been posted by the Forest Service.

This is not a case where the lands had been withdrawn from the provisions of the mining laws or were acquired National Forest Lands not subject to mineral development, as in Thompson v. United States, 9 Cir.1962, 308 F.2d 628. Nor is it a case of controversy over ownership or mineral rights in private land wherein defendants conducted their exploration, examination and location of the property under a clouded or colorable title. Cf., Reickhoff v. Consolidated Gas Co., 1950, 123 Mont. 555, 217 P.2d 1076. It is not a case in which the material was taken by knowing and wilful trespassers. Cf., Pine River Logging & Improvement Co. v. United States, 1902, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed. 1164; Bolles Wooden Ware Co. v. United States, 1882, 106 U.S. 432, 1 S.Ct. 398, 27 L.Ed. 230.

The fact that the claimants received advice of reputable counsel that their claims were valid may be considered in determining the question of their good faith.[23] And this was not a mere mistake of law for which there is no excuse. In determining the validity of defendants' claim the court has found it necessary to rely upon evidence supplied by experts in the fields of animal and plant nutrition, soil science, geology, mineral engineering, chemistry, agronomy and horticulture, as well as conduct considerable research into the applicable law with the aid of able and exhaustive briefs on both sides.[24]

█ I find that the defendants asserted and operated the JWT Placer Claim in good faith and were not wilful trespassers and/or converters of the materials located thereon.

█ In such case the measure of damages is the value of the material in place before it was disturbed. Bolles Wooden Ware Co. v. United States, supra. According to plaintiff's witnesses, the peat muck material is common and similar to that found covering approximately 80 million acres in the United States and is so low in organic matter it may not be classified as better than muck and is an inferior grade of peat below standards set by the Federal Trade Commission regulations (see 16 CFR § 185.2); and the subsoil material is of no commercial value.[25] Plaintiff's witness-

271 F.2d 836; Best v. Humboldt Placer Mining Co., supra.

22. In a footnote, the Court said in part: "We are told that nine hearing Examiners are assigned to mining claim cases, that mining claims comprise from 75% to 85% of their hearings, and that in the fiscal year 1960–61, 322 mining-law cases (involving 1,162 separate claims) were brought before the hearing Examiners. Of these, 81 cases (343 claims) were closed on procedural grounds without a hearing; in 241 cases (involving 819 claims), hearings on the merits were held and decisions rendered by the hearing Examiner; in 90 of these cases, appeals were taken to the Director of the Bureau of Land Management."

23. Mason v. United States, 1923, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396; Delta Drilling Co. v. Arnett, 6 Cir. 1950, 186 F.2d 481, 486, cert. denied 340 U.S. 954, 71 S.Ct. 574, 95 L.Ed. 688; United States v. McCutchen, S.D.Calif.1916, 238 F. 575.

24. Where claimants proceeded upon the advice of counsel and a long and difficult lawsuit was necessary to clarify the points at issue, it was held in Delta Drilling Co. v. Arnett, supra, 186 F.2d at 486, that "such circumstances indicate that the trespass was not willful".

25. Were a value to be placed upon the subsoil material, it is clear that defendants would be entitled to their expenses of extraction. United States v. Wyoming, 1947, 331 U.S. 440, 458, 67 S.Ct. 1319, 91 L.Ed. 1590. To date the total business expenses of Tracana have exceeded the total receipts obtained from sale of the material. See Anno.: 21 A.L.R.2d 380, 383, for rules with respect to the measure of damages for nonwilful trespass in extraction of minerals, and particularly page 386, where it is stated: "It has also been held that where the cost of production is greater than the value of the mineral produced, the party injured by the nonwilful trespass is not entitled to recover anything."

es testified that it would cost $767 to restore the premises to their original condition.

30 U.S.C.A. § 612 provides that rights under mining claims of the United States shall be subject to the right of the United States to manage and dispose of the vegetative surface resources. 43 CFR § 185.122 regulates surface use of mining claims pursuant to that statute. Some 1605.3 cubic yards of peat material were disturbed and 1192.43 cubic yards of that removed. The going price for Government peat was $2 per cubic yard,[26] although, as noted supra, the Government witnesses testified that this is an inferior peat.[27] The peat was in fact removed, however, and the Government will be allowed $2 per cubic yard for the 1192.43 yards removed, together with the sum of $767 to cover the cost of restoring the premises.

### SUPPLEMENTAL OPINION

The foregoing was prepared and submitted to counsel as a tentative opinion on February 27, 1963, with a letter advising counsel that the court would "permit the parties, if they so desire, to offer further expert testimony on the issue of whether the trace minerals constitute a valuable mineral deposit, and particularly whether the mineral content of the Tracana material enriches or benefits agricultural soil and if so, what produces the beneficial results".

The court was advised by counsel that the defendants desired to submit samples of the material to laboratories for analysis. Plaintiff then concluded that it would also have a further analysis and evaluation. No further evidence has been submitted on behalf of the defendants.

The plaintiff has submitted a report prepared by the Kearney Foundation of Soil Science of the University of California at Davis, California, entitled "Comparative Analytical and Greenhouse Tests of Soil Specimens 'JWT, Bagged Product' and 'JWT–2, 7–15–63' Submitted by the USDA Forest Service with Yolo Sandy Loam", together with a letter of transmittal signed by Perry R. Stout. The report has been received in evidence, without objection. Counsel for defendants has objected to the transmittal letter as hearsay. In this opinion the court has relied upon the report with respect to all findings and conclusions and has considered the letter solely for the purpose of explaining what tests and comparisons were made.

The "JWT, Bagged Product" was a sample of the material packaged and sold by Tracana Enterprises, Inc.; the "JWT–2, 7–15–63" was a sample of material taken from the claim by representatives of the parties on July 15, 1963; and "Yolo Sandy Loam" was a "good agricultural soil of well known performance with many kinds of crops", an "extensive alluvial valley soil used in highly diversified agricultural production", and considered a "mineral soil" in contrast with peat or muck, which are normally referred to as "organic soils".

The report states that neither of the Tracana specimens "demonstrated plant nutrient elements in amounts significantly greater than the agricultural Yolo Sandy Loam soil". Various comparative tables are included in the report, one of which shows the comparative value of the three samples "as sources of the recognized mineral elements required for the growth of higher plants". The respective "nominal value of all potentially available nutrients per ton of soil material" were: JWT, Bagged Product, 54¢; JWT–2, 7–15–63, 66¢; and Yolo Sandy Loam, 53¢.

The "Tracana Soluble Mineral" was also compared with the mineral content

---

26. The Forest Service Handbook, §§ 2435.-27 and 2435.28, provides for the sale of peat as a forest product under 36 CFR § 221.20.

27. I do not consider it necessary to go into defendants' evidence to the contrary, which was given by users of the peat moss, in view of the fact that I am allowing plaintiff the going government price of the peat removed.

of American soils, as set forth in recognized authorities on this subject. According to the report of this comparison, "it appears that the specimens offer nothing unusual in the way of mineral nutrients beyond that generally encountered in American soils".

Considering the evidence as a whole, including the foregoing report, I find that the defendants have failed to prove that the trace elements in "Tracana Soluble Mineral" constitute "valuable minerals" within the meaning of the mining laws.

The individual defendants moved for a nonsuit on the grounds that the evidence failed to establish trespass by the individual defendants, and failed to show what portion, if any, of the material taken was attributable to any individual defendant.

The defendant corporation was organized on January 21, 1960. The claims were filed by the individual defendants on April 11, 1960. By two quitclaim deeds dated October 21, 1960, they conveyed their interests to the corporation. Of the individual locators, only Toole, his wife, and Milohov became stockholders of the corporation. Toole, who was the majority stockholder, testified that his holdings were received in exchange for contributions of cash and equipment.

■ No placer claim may include more than 20 acres for each individual claimant. 30 U.S.C. § 35. Within the meaning of this section, a corporation is an individual claimant. Gird v. California Oil Co., C.C.S.D.Cal.1894, 60 F. 531. Under section 36, two or more persons may make a joint entry, up to 160 acres. Here the eight individual defendants, as an association, acquired the possessory and exploitation rights in the 160 acres in question.

■ The use of dummy locators, with a subsequent transfer of interest to one or a few promoters will render a location invalid. Cook v. Klonos, 9 Cir. 1908, 164 F. 529; Nome & Sinook Co. v. Snyder, 9 Cir. 1911, 187 F. 385. In the latter case the court said: "Any scheme or device entered into whereby one individual is to acquire more than that amount or proportion in area constitutes a fraud upon the law, and consequently a fraud upon the government, from which the title is to be acquired, and any location made in pursuance of such a scheme or device is without legal support and void."

■ Any claim of the defendants must be based upon the location filed by the eight individual locators. The corporation could not itself have filed the claim. It would appear from all of the evidence that dummy locators were used in acquiring the property for the corporation and its principal stockholders.[28] The participation of the individual defendants as locators permitted the resulting trespasses. Under these circumstances the individual locators may not escape liability for the trespasses by the mere transfer of their interests to the corporation. It is my conclusion accordingly that all of the defendants are jointly and severally liable for the damages sustained.

Defendants have requested permission to restore the premises in lieu of payment of the estimated cost thereof. I assume that the parties will reach an agreement for this method of restoration.

This opinion will constitute findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure; although counsel for plaintiff may, if they so desire, submit separate findings and conclusions. Counsel for plaintiff, pursuant to Rule 11(b) of the Local Rules of Court, will prepare, serve and lodge form of judgment.

28. This is not a case where individual locators simply decided that a corporate organization could better handle their joint interests, and each locator retains, through the agency of the corporation, "the exact interest in the land which he acquired under his location". See Borgwardt v. McKittrick Oil Company, 1913, 164 Cal. 650, 130 P. 417, 419.