Ruth SNYDER, Administratrix of the Estate of C. F. Snyder, Deceased, J. F. Allison, Marilyn Sitton, Administratrix of the Estate of Max Sitton, Deceased, and F. A. Sitton, Plaintiffs,

v.

Stewart L. UDALL, Secretary of the Department of the Interior of the United States of America, Defendant.

Civ. A. No. 66–C–131.

United States District Court
D. Colorado.

April 18, 1967.

Tognoni & Pugh, Hale C. Tognoni, Phoenix, Ariz., and Robert L. Tognoni, Littleton, Colo., for plaintiffs.

Lawrence M. Henry, U. S. Atty., Richard T. Spriggs, Asst. U. S. Atty., Denver, Colo., and Thomas L. McKevitt, Atty., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

CHILSON, District Judge.

This matter came on to be heard before the Court on the 20th day of February, 1967. The Court heard the arguments of counsel and has considered the briefs filed by the parties and is fully advised.

This is an action to set aside a decision that the Master Deluxe and the DeLuxe mining claims are invalid.

On July 10, 1941, C. F. and C. A. Snyder located the Master Deluxe and Deluxe mining claims on public lands in the Slick Rock area of San Miguel County, Colorado. The claims are located in Sections 22 and 27, T. 44 N., R. 19 W., N. M. P. M.

On March 30, 1948, by Public Land Order 459, the lands upon which the claims were located were withdrawn from mineral entry *subject to valid existing rights.* No steps were taken by the Government at that time to question the validity of the claims.

In 1958 and 1959, some 2,500 tons of vanadium and uranium ore were produced from the claims (Tr. 255). In 1960, the Bureau of Land Management of the Department of Interior (hereafter referred to as B. L. M.) instituted proceedings to have the claims declared invalid on the ground that there had been no discovery of minerals on the claims prior to the withdrawal of March 30, 1948.

Following prescribed procedure, a hearing was had before a B. L. M. Hearing Officer, who declared the claims invalid. Upon appeal to the Director of B. L. M. and further appeal to the Secretary of Interior, the decision of the Hearing Officer was affirmed.

The sole ground for contest of the claims is B. L. M.'s assertion that there

was "no discovery" prior to the March 30, 1948 withdrawal of the land from mineral entry. The parties agree the burden of proof is upon B. L. M. to make a prima facie case of "no discovery."

The matter is now before the Court to review the record made before the Hearing Officer to determine whether or not there is substantial evidence making a prima facie case in support of the Secretary's decision affirming the Hearing Officer's determination that there was no discovery. Pan American Petroleum Corp. v. Udall, 352 F.2d 32 (10th Cir. 1965); Dredge Corporation v. Penny, 338 F.2d 456 (9th Cir. 1964).

Before discussing the evidence, it becomes important to define "discovery." The applicable statute, 30 U.S.C. § 23, provides: " * * * no location of a mining claim shall be made until the *discovery* of the vein or lode * * *." (Emphasis supplied.)

██ Although the statute does not define the word "discovery", it is now well established that a discovery required by the statute consists of:

1. The discovery of minerals within the boundaries of the mining claim: and

2. The discovery must be such as would justify a person of ordinary prudence in the further expenditure of his time and means in an effort to develop a paying mine (Cameron v. U. S., 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659; Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770).

We have reviewed the evidence to determine whether or not B. L. M. sustained its burden of proof.

The following facts are not in dispute: The claims were located on July 10, 1941 and Location Certificates were recorded in the public records of San Miguel County in September 1941; at the time of location there was a discovery of vanadium-uranium mineral; from 1944 until 1958, the annual assessment work was done or the required notice in lieu of assessment work was filed; (See abstract in file.) at the time of the examination of the claims by B. L. M. in 1959 and 1960, there was mineral in place, principally vanadium-uranium; of the samples taken by B. L. M. and assayed, most were of low grade, but one was of ore grade (Tr. pgs. 56, 57, 204 and 212); in 1958, Sitton acquired a one-half interest in the claims and after some exploratory drilling, sunk a shaft to an ore body approximately 200 feet below the surface from which some 2,500 tons of uranium-vanadium ore were produced (Tr. pgs. 250, 251 and 255).

At the hearing, B. L. M. called two of its employees (Spengler and McIntosh) to prove a prima facie case of no discovery. Both testified as expert witnesses that although there was a discovery of mineral on the surface of the claims, in their opinion the mineral discovery did not constitute a discovery sufficient to support a valid mining claim and gave their reasons for their opinions in considerable detail.

After careful consideration, we conclude the testimony of Spengler and McIntosh is without probative value for the following reasons:

1. The witnesses were not qualified to give opinion testimony as to what a man of ordinary prudence would or would not have done in 1941 with regard to the expenditure of time and means in an effort to develop a paying mine on these claims.

2. Even if Spengler and McIntosh had the qualifications to testify as experts, their expert testimony has no probative value because they based their opinions of "no discovery" on information available to the witnesses at the time of the hearing in May 1961 and not on the information available to a person of ordinary prudence in 1941 when the minerals were discovered and the claims were located.

3. That the witnesses Spengler and McIntosh, in arriving at their opinions

of "no discovery" included a requirement of discovery not required by the Supreme Court in Cameron, supra, namely, that the "discovery" must be a discovery of minerals of sufficient commercial value to justify mining them with an expectation of profit.

## I. GOVERNMENT'S WITNESSES LACKED QUALIFICATIONS TO GIVE OPINION.

"An expert witness will be deemed qualified if, and only if, he possesses special skill or knowledge with respect to the matter involved so superior to that of men in general as to make his formation of a judgment a fact of probative value." 32 C.J.S. Evidence § 457 p. 98.

Exhibit 38 sets forth the qualifications of Spengler. He graduated in June 1955 from the City College of New York with a Bachelor of Science Degree; July 1955 to September 1955, helper on a diamond core drill; September 1955 to February 1957, geologist with the Atomic Energy Commission; February 1957 to present, employed by B. L. M. as Evaluation Engineer.

Exhibit 40 gives the qualifications of McIntosh. He graduated in June 1941 from the Ohio State University with a Bachelor's Degree in engineering and mining; June 1939 to October 1939, worked in a coal mine in Kentucky; June 1940 to October 1940, a laborer in gypsum exploration; June 1941 to October 1941, a laboratory worker; June 1942 to October 1942, prospecting in Nova Scotia; October 1942 to March 1944, metallurgist in beneficiating magnacite ores; March 1944 to September 1946, military service; September 1946 to July 1948, research engineer on beneficiating of ores by flotation; July 1948 to December 1949, laborer, panner of gold, placer prospecting, rod-man, gold cleanup man and assayer in Fairbanks, Alaska; February 1950 to March 1952, flotation research, dolomite prospect drilling, prospecting open-pit layout; April 1952 to December 1953, geodetic computer and surveying for U. S. Geological Survey; September 1953 to February 1955, metallurgist beneficiating manganese ores by flotation; March 1955 to March 1957, metallurgist beneficiating gold, silver, lead, zinc ores by flotation; March 1957 to present, employed by B. L. M. as Evaluation Engineer.

The prudent man rule, as applied to discovery of mining claims necessarily means a prospector of ordinary prudence who is attempting to locate deposits of minerals which would justify the expenditure of time and effort to develop a paying mine. The standards to be applied in determining what a prudent prospector would or would not do are not those of a trained engineer or geologist and are not even necessarily determined by the prudence of a *skilled miner*. Chrisman v. Miller, 197 U.S. 313 at 323, 25 S.Ct. 468, 49 L.Ed. 770. There is nothing in the background and experience of either Spengler or McIntosh which would give them any special knowledge of what a prospector of ordinary prudence would or would not do in attempting to develop a vanadium or uranium mine on the Colorado Plateau in 1941.

Neither of them had any experience in prospecting for or in the development of vanadium and uranium claims in the Colorado Plateau area or elsewhere. Perhaps Spengler had expertise as to what a trained geologist would or would not have done in the circumstances and perhaps McIntosh had expertise to testify as to what a trained mining engineer would or would not have done, but the evidence discloses no foundation for their opinion testimony as to what a prospector of prudence would or would not do. Because of lack of qualifications, the opinions of Spengler and McIntosh are without probative value and in the absence of their opinions, there is no evidence to sustain the Government's burden of proof.

II. GOVERNMENT'S WITNESSES BASED THEIR OPINIONS ON INFORMATION AVAILABLE TO THEM IN 1961 AND NOT ON INFORMATION AVAILABLE TO A PERSON OF PRUDENCE IN 1941.

In support of their opinions, Spengler and McIntosh testified to the geology of the area, the size, shape and location of mineral deposits in the Colorado Plateau; the nature and extent of surface mineralization of the claims in question; the samples taken and their assay values; the costs of mining; the market values of vanadium and uranium and the market for these minerals.

██ All of these areas of inquiry were pertinent and material as they are matters which a prudent prospector might well take into account in determining whether or not a mineral discovery justified the expenditure of time and means in an effort to develop a paying mine. However, these areas of inquiry were pertinent and material only to the extent that it was shown that the information testified to was available to a prudent prospector at the time the plaintiffs located their claims. Information not available to a prudent prospector at that time is entirely immaterial in determining what a prudent prospector would or would not have done. Even a casual reading of the record discloses that the witnesses based their opinions not on information available to the claimants as prudent prospectors in 1941 but upon information available in 1961 to these witnesses after careful research and study.

Some of the more extreme examples of this are tabulated below:

1. Exhibit 4, a U.S.G.S. Quadrangle geologic map was admitted in evidence to show the geology of the area and was used by the witnesses in giving their opinions on what a prudent prospector would or would not do. *This map was published in 1950* (Tr. pgs. 13 and 14).

2. Exhibit 5, a U.S.G.S. map was admitted into evidence and used in connection with testimony. *It was published in 1948* (Tr. pgs. 14 and 15).

3. Exhibit 39, a U.S.G.S. paper on the "Geology and Uranium-Vanadium Deposits of the Slick Rock District, San Miguel and Dolores Counties." It was admitted into evidence as part of the basis for the conclusion of the witnesses that there was no discovery in 1941. *This document was published in 1958* (Tr. pg. 101).

4. The witnesses testified to three theories of the U.S.G.S. as to ore placement. Which of these theories is correct has not yet been resolved (Tr. pg. 27). There was no showing that these theories had been published or were otherwise available to a prudent prospector in the year 1941. The purpose of this testimony was, "We contend that certainly one of the things he (a prudent person) would have to take into consideration is, how did these ore bodies, if there are any, get here, and is there any connection between what might be at the surface and what might be at the depth." (Tr. pg. 30) The witness McIntosh also testified to these theories (Tr. pg. 195). Nowhere in the entire transcript is there any evidence or indication that these theories had been made known to the public in the year 1941 or at any other time.

5. Use of a Geiger counter in appraisal of surface mineralization (Tr. pgs. 42 and 43). There is no testimony that a Geiger counter was available as a prospecting tool in 1941. In fact, the evidence indicates it was not (Tr. pg. 244).

6. Use of Atomic Energy Commission buying guide to establish the price of uranium and vanadium ores with the ultimate objective of showing the absence of valuable deposits on the claims (Tr. pgs. 112, 113 and 215). *The Atomic Energy Commission was not established until April 1946 and the buying guide was not issued until April 1948 and covered the period from 1951 to 1961* (C.F.R. Title 10, Part 60 and Tr. pg. 215).

7. Both witnesses testified as to the costs of mining for the purpose of showing that a prudent prospector, because of these costs, would not expend time and effort in attempting to develop a paying mine. *This testimony was based on a Bureau of Mines publication issued in 1959 based on "recent costs"* (Tr. pgs. 115, 159 and 161).

8. Reliance on publications and articles in support of the opinion that there was no connection between surface mineralization and the deposit which was mined in 1958 (Tr. pgs. 178 and 179). The publications relied upon are listed at pages 180 and 184 of the transcript. Of the approximate 13 publications mentioned, four were published prior to 1941, one in 1947 and *the eight remaining publications were published from 1952 to 1959.* All of this material was considered in arriving at the opinion that a prudent prospector would not be justified in expending time and effort in attempting to develop a paying mine in 1941 (Tr. pg. 183).

9. Use of market price established by Atomic Energy Commission for uranium and vanadium in the *years 1951 to 1961* (Tr. pg. 215) to support opinion that a prudent prospector could not expect to develop a paying mine in 1941.

Claimants, by repeated objections, sought to have the testimony directed towards facts and information which may have been available to a prudent prospector at the time the claims were located but to no avail.

We conclude that the opinions of the witnesses, based as they were on information, facts and factors not shown to have been available to the Claimants at the time of the location of their claims, are without probative value.

## III. WITNESSES OPINIONS WERE BASED ON AN ERRONEOUS LEGAL THEORY.

"It has frequently been stated that discovery in order to be valid need not be of ore in commercial quantities or of quantity and quality which will yield a profit." (American Law of Mining, Vol. I, § 4.26, pg. 642).

"If the miner were required to demonstrate commercial value at the time he makes his initial discovery, the intent of the mining laws would be totally frustrated; and the value requirement contained in the prudent man test thus seems to represent a reasonable tempering of the statutory value requirement to the very real problems facing the discoverer and locator who goes upon the ground to stake his claim." American Law of Mining, Vol. I, § 4.26, pg. 643).

"Although the Land Department still recognizes the prudent man test and has stated that it is not necessary to show values which will demonstrate that a 'claim can be worked at a profit or that it is more probable than not that a profitable mine operation can be brought about,' at least in cases involving minerals having intrinsic value, the recent decisions of the Land Department indicate that it has adopted a very strict view of discovery, and is quite close to requiring a showing of commercial value even in cases not involving common varieties of mineral." (American Law of Mining, Vol I, § 4.26, pg. 645).

Consideration of the testimony of the witnesses Spengler and McIntosh reveals that their opinions of "no discovery" are based on the premise that the minerals discovered were not of commercial value and therefore the discovery is not sufficient to sustain a valid mining claim.

The witness McIntosh testified that the minerals discovered by the claimants deserved "some more exploratory work, but they do not deserve the commencing of mining operations." (Tr. pg. 212).

He testified further:

"Q Now, let's assume for the moment, Mr. McIntosh, that all of the workings that have been placed on these claims since 1948 are not used. Based upon just the showings that are on the surface which you have examined,

would any expenditure be justified for further exploration based upon these showings?

"A Yes, it would.

"Q Why?

"A Because there is a meager showing of uranium and vanadium present, and it's barely possible that it could lead to something worth while.

"Q Now, I would then ask you the same question, whether an expenditure would be justified for development of mining operations *to mine any of these shows* of minerals which we are talking about?

"A No, it definitely would not be justified." (Tr. pgs. 220 and 221) (Emphasis added).

He testified further:

"A The locators located their mining claim in 1941. They produced no ore before the 1950's. And the claim was still in the exploration stage. And in the 1950's several lessees or several sublessees went on the claims, but they produced no ore, either. The claims were still in the exploration period. These lessees or sublessees did exploration work consisting of drilling a hole. About 1958 the present operators of the claim went on to the claims and found an ore body which they are now mining. *To me, the date that this last group went on the claims, sunk their holes and found ore, was the date the claims passed from the exploratory state to the development and production stage.*" (Tr. pg. 226) (Emphasis added).

It is apparent from this testimony that the witness McIntosh did not recognize a discovery until after all exploration work was done and actual production of commercial ore had commenced.

To the same effect is the testimony of the witness Spengler:

"Q Now, then, as I get it from your testimony, it would be your opinion that in order to make a valid discovery, you would have to have a pit that practically went to ore that was commercially marketable; is that correct?

"A The pit which the claimant relies upon for his discovery must show an indication of mineralization, such that the claimant has the reasonable prospect of *developing a paying mine from this show.* The claimant, as I have testified previously, would base his opinion upon the extent of his mineralization and its geologic habit, upon geologic inference, upon similar shows of mineral in the vicinity, and *if he had such a showing of minerals that he was reasonably assured of developing a paying mine from this show of mineral, he would be justified in staking a mining claim.*" (Tr. pg. 138) (Emphasis added).

Although the test used by the witnesses may be in accord with B. L. M. policy, it goes far beyond the requirements of *Cameron,* supra, and their opinions of "no discovery", being based on an erroneous test, are without probative value.

For the reasons assigned, the Court concludes that B. L. M. did not make a prima facie case of "no discovery" and that the decision of the Hearing Officer and its affirmance by the Assistant Director of B. L. M. and by the Solicitor, acting for the Secretary of Interior, should be set aside.

It is therefore ordered, adjudged and decreed that the decision of the Hearing Officer entered on June 15, 1962 in Colorado Contest No. 236—United States v. C. F. Snyder, et al., declaring the Deluxe and the Master Deluxe Lode Mining Claims, heretofore described, invalid and the decision of the Assistant Director of B. L. M. and the decision of the Assistant Solicitor of Land Appeals, acting for the Secretary of Interior, affirming the decision of the Hearing Officer upon appeal, are hereby set aside.