**HENAULT MINING COMPANY,**
Plaintiff,

v.

**Harold TYSK, Individually and as Montana State Director of the Bureau of Land Management, and Stuart L. Udall, individually and as Secretary of the Interior, Defendants.**

Civ. No. 634.

United States District Court
D. Montana,
Billings Division.

July 24, 1967.

Carrell & Scovel, Rapid City, S. D., and Crowley, Kilbourne, Haughey, Hanson & Gallagher, Billings, Mont., for plaintiff.

Moody Brickett, U. S. Atty., Butte, Mont., and Clifford E. Schleusner, Asst. U. S. Atty., Billings, Mont., for defendants.

## ORDER and MEMORANDUM OPINION

JAMESON, Chief Judge.

■ This is an action for a declaratory judgment[1] determining the validity of 18 mining claims owned by plaintiff and for review of a decision of the Secretary of the Interior under the Administrative Procedures Act.[2] Both sides have moved for summary judgment.[3]

In 1960 defendant Montana State Director of the Bureau of Land Management instituted a proceeding, authorized by the Act of July 23, 1955 (commonly called the Multiple Surface Uses Act) 30 U.S.C. §§ 612 and 613, against a group of 21 contiguous lode mining claims which were located and held by the mining claimant (plaintiff) for many years prior to the enactment of the Act. The purpose of the proceeding was to determine the right of the Montana State Director to manage and dispose of the vegetative surface resources and to manage other surface resources (except mineral deposits subject to location under the mining laws of the United States). 30 U.S.C. § 612(b).

■ On all claims located prior to the enactment of the Multiple Surface Uses Act, the Bureau of Land Management must establish the invalidity of those locations in order to subject the land to the Act's reservation of surface resources.[4] The Director attempted to do so by alleging in his proceedings that the locations were invalid for lack of "discovery" required under the mining laws of the United States. 30 U.S.C. § 23.

1. Federal Declaratory Judgment Act, 28 U.S.C.A. § 2201 et seq.

2. 5 U.S.C. §§ 1001–1009. Section 1009(a) provides: "Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

3. Summary judgment is a proper remedy in judicial review of an agency decision, where only a question of law is present-

ed. Dredge Corporation v. Penny, 9 Cir. 1964, 338 F.2d 456.

4. When the Government contests the validity of a mining claim, it has the burden of going forward with sufficient evidence to establish a prima facie case. Thereafter the burden shifts to the claimant to show by a preponderance of the evidence that his claim is valid. Foster v. Seaton, 1959, 106 U.S.App.D.C. 253, 271 F.2d 836, 838; United States v. Toole, D.Mont.1963, 224 F.Supp. 440, 441, 445.

A decision was entered by a hearing examiner on July 10, 1964, holding that there was a "discovery" under the mining laws of the United States and dismissing the Director's proceedings as to 18 claims.[5] This decision was reversed by the Acting Chief, Office of Appeals and Hearings, on August 12, 1965, on the ground that the examiner's decision was based on geological inferences and not on facts. This reversal was affirmed by the Secretary of the Interior on June 15, 1966.

The primary issue before the Secretary upon appeal was whether the findings of the hearing examiner were sufficient to constitute a discovery under mining laws. A secondary issue was whether the mining claimant's (plaintiff) proposed findings of fact, 10, 11 and 12 were material and should have been granted by the examiner.

The Secretary held that, "The evidence clearly establishes that a discovery, as that term is understood and used by the Department, * * * has not been shown on any claims in question," and that proposed findings 10, 11, and 12 are "immaterial to the question of discovery and therefore immaterial to the outcome of this case."

 The issue here presented is whether the agency action, findings, and conclusions contained in the Secretary's decision were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 1009(e)(B)(1). The scope of inquiry and judicial review granted this court by the Administrative Procedure Act includes the power and authority to decide all the relevant questions of law and to interpret the statutory provisions involved in the decision of the Secretary. 5 U.S.C. § 1009.[6]

In order to validate a mining claim under the mining laws of the United States there must be a discovery of a valuable mineral deposit within the limits of the claim. 30 U.S.C. §§ 23, 25. The rules for determining whether the necessary discovery has been made were well summarized by the Court of Appeals for the Ninth Circuit in the recent case of Coleman v. United States, 1966, 363 F.2d 190, where the court reversed a summary judgment entered by the district court in favor of the Government upholding the decisions of the hearing examiner, Acting Director of the Bureau of Land Management, and Secretary of the Interior.[7] The court said in part:

"The basic test used to determine whether such discovery has been made was stated by the Department in Castle v. Womble, 19 I.D. 455, 457 (1894), to be that:

'* * * where minerals have been found and the evidence is of such character that a person of ordinary prudence would be justified in further expenditures of his labor and means, with a reasonable prospect of success, in developing a valuable mine, the requirements of the statute have been met.'

This standard has been judicially approved. Chrisman v. Miller, 197 U.S. 313, 25 S.Ct. 468, 49 L.Ed. 770; Cameron v. United States, 1920, 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659; Best

---

5. The Government recognized the validity of two of the 21 claims. The hearing examiner held one claim invalid, and no appeal was taken from his decision.

6. It is recognized that the court may not weigh evidence adduced in an administrative proceeding, and if, upon review of the entire record, there is found substantial evidence to support the Secretary's decision, it must be affirmed. Henrikson v. Udall, 9 Cir. 1965, 350 F.2d 949. All parties agree, however, that there is no genuine issue of fact and accept the findings of the hearing examiner.

7. The United States petitioned for a rehearing. An order was entered joining the Secretary of the Interior as a counterclaim defendant and appellee, and a rehearing was granted. Following briefs and oral argument, an order was entered June 20, 1967, reading in pertinent part: "After thorough reconsideration of the issues involved and the arguments of the imposing parties, the Court adheres to and confirms the opinion and decision filed June 21, 1966."

v. Humbolt Mining Co., 1963, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350." (363 F.2d at pp. 196–197).

" * * *

"The applicable criteria of presence of a valuable mineral in each of the claims is whether a person of ordinary prudence would be justified in further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine." (at p. 203).[8]

Factors to be considered in applying the "prudent man" test with respect to a lode claim were set forth in Jefferson-Montana Copper Mines, 1912, 41 L.D. 320, as follows:

"1. There must be a vein or lode of quartz or other rock in place;

"2. The quartz or other rock in place must carry gold or some other valuable mineral deposit;

"3. The two preceding elements when taken together must be such as to warrant a prudent man in the effort to develop a valuable mine.

"It is clear that many factors may enter into the third element: the size of the vein as far as disclosed, the quality and quantity of mineral it carries, its proximity to working mines and location in an established mining district, the geologic conditions, the fact that similar veins in the particular locality have been explored with success, and other like facts, would all be considered by a prudent man in determining whether the vein or lode he has discovered warrants a further expenditure or not."

The findings of the hearing examiner were fairly summarized in the decision of the Secretary. After referring to the examiner's finding that a comparison of the values of the samples taken by the geologists for both the Government and the claimant "revealed, within the limits of human tolerance, similar results", the decision of the Secretary continued:

" * * * He (the examiner) noted that, although the gold and silver content of the samples taken varied from trace amounts to a high of $15.87 per ton in one sample, the values found in the great majority of the samples ranged from 9 cents to less than $1.00 per ton. The examiner found this evidence to be conclusive that there are exposed within the limits of each claim, (* * *) veins or lodes of rock in place containing some amounts of gold and silver, and he found the evidence to be conclusive that there is no surface exposure of minerals on any of the claims which can be mined at a profit.

"The examiner further found that all of the experts in the field of geology who appeared at the hearing testified that the land upon which the claims are situated is mineral in character, that the claims are surrounded by patented mining claims and that they lie immediately adjacent to the present working area from which the Homestake Mining Company, the largest gold producer in the United States, is extracting ore at a profit. He found that appellant's witness Wright has an intimate knowledge of the geology of the area, that he was employed by the Homestake Mining Company from 1919 to 1931, for the last six years of that period as chief geologist for the company, that he is thoroughly familiar with all of the mining and geologic technical publications on the Black Hills region and that he conducted and supervised the examination of the Henault claims which culminated in the 1948 and 1961 reports. He then summarized Wright's conclusions as follows:

'1. That the Henault Mining Company's claim group lies within the province of major gold mineralization in the Black Hills.

2. That the claims lie adjacent to the country's greatest producer of

---

8. See also United States v. Toole, supra, and cases there cited.

gold which is of no significance except that the geologic structural relation are such that the proximity has real value.

3. That the geology of the Henault ground is structurally related to that of the Homestake Mining Company's ground and ore deposits in such a manner that the possibility of deep ore deposits such as are being developed by Homestake may reasonably be expected at minable depths at Henault.

4. The values in gold and silver existing in Henault ground can only lead to the conclusion that these surface expressions are "upward leaks" effected at the time of mineralization from substantial deposits below.

5. That the tertiary dike zone through the center of the Henault claims emplaced in an anticlinal structure (believed to elevate the favorable Homestake formation closer to the surface) is additional incentive to moderately deep exploration for substantial amounts of ore.

6. That all Henault holdings are of mineral character and, considering that almost all surrounding grounds have been patented, are entitled to the same consideration for patent.'

"The examiner then noted that Wright recommended that at least three holes be drilled to a depth of 3500 to 4000 feet to probe for minerals at depth. The soundness of Wright's recommendations was attested to by Professor Edwin H. Oshier, a mining engineer and head of the Department of Mining Engineering at the South Dakota School of Mines and Technology, who had not personally examined the claims but whose opinion was based upon a review of Wright's reports and upon Wright's reputation as an authority on the geology of the northern Black Hills.

"The examiner found that, although the qualifications of the Government's expert witnesses could not be questioned, neither of the two witnesses who testified in behalf of the Government had as thorough a knowledge of the geology of the area as did Wright and that, from a geologic standpoint, their examinations did not approach those of Wright in thoroughness. He, therefore, accepted the recommendations of Wright as to the possibilities for following the veins or lodes on the surface of the Henault claims as being the best available information upon which a prudent man would rely."

Simply stated, we have this situation: There has been exposed within the lands of each claim a vein of rock in place containing gold and silver, although there is no surface exposure which can be mined at a profit. The claims are adjacent to the largest gold producing claims in the world. The best qualified geologist for the area concluded that the values in gold and silver existing on the ground can only lead to the conclusion that the surface expressions are "upward leaks" effected at the time of mineralization from substantial deposits below. On the basis of his findings and conclusions he recommends the expenditure of a substantial sum of money in drilling holes to probe for minerals at depth.[9] Do the findings, conclusions and recommendations of the witness Wright support the examiner's conclusion that there was a "discovery"?[10]

 The examiner recognized, as does the court, that "geological infer-

---

9. The Examiner found that at an estimated cost of $14.50 per foot the drilling would entail expenditures of $360,000.00 to $480,000.00. The Secretary, apparently with good reason, questions the mathematical accuracy of the totals, but there is no doubt the amount is substantial.

10. According to the Secretary, the Government does not challenge the validity of Wright's findings and recommendations but only the legal effect of his findings, stating that the "sole issue in this appeal is whether those findings, considered alone or with the established facts of the case, are sufficient to constitute a discovery under the mining laws."

ence" standing alone may not be accepted as a substitute for discovery, but concluded that such evidence "is of prime importance in determining whether or not values exposed in veins or lodes, if followed, could reasonably be expected to lead to greater values at depth." He concluded further, and in my opinion correctly, that "evidence as to the geology of the region, the proximity of the claims to working mines, the economics of mining, and any other fact or circumstance which might possibly affect the success of a mining venture, would necessarily be considered by a prudent man in determining whether or not he would expend further time and money in following the veins or lodes exposed, and is relevant evidence." [11]

██ I agree also with the examiner's conclusion that "If, in the face of the evidence presented, it were held that no discovery had been made it would be tantamount to holding that no discovery exists until paying ore is exposed. This is not the law." [12]

In two recent cases in the District of Colorado, Snyder v. Udall, 267 F.Supp. 110, decided April 18, 1967, and Garula v. Udall, 268 F.Supp. 910, decided April 26, 1967, Judge Chilson, in setting aside decisions of the hearing examiners, Bureau of Land Management, and Secretary of the Interior, held that they were based on an erroneous legal theory and in effect required discovery of ore of commercial value to validate a mining claim. Judge Chilson quoted with approval the following excerpts from American Law of Mining:

"It has frequently been stated that discovery in order to be valid need not be of ore in commercial quantities or of quantity and quality which will yield a profit." (Vol I, § 4.26, pg. 642).

"If the miner were required to demonstrate commercial value at the time he makes his initial discovery, the intent of the mining laws would be totally frustrated; and the value requirement contained in the prudent man test thus seems to represent a reasonable tempering of the statutory value requirement to the very real problems facing the discovered and locator who goes upon the ground to stake his claim." (Vol I, § 4.26, pg. 643).

"Although the Land Department still recognizes the prudent man test and has stated that it is not necessary to show values which will demonstrate that a 'claim can be worked at a profit or that it is more probable than not that a profitable mine operation can be brought about,' at least in cases involving minerals having intrinsic value, the recent decisions of the Land Department indicate that it has adopted a very strict view of discovery, and is quite close to requiring a showing of commercial value even in cases not involving common varieties of mineral." (Vol I, § 4.26, pg. 645).

In my opinion the Government has in effect required "a showing of commercial value" in this case. This is apparent from a reading of the transcript, particularly the testimony of the Government's geologist, who testified that on the claims in question the quartz or other rock in place does not carry gold or some other thing of value as a mineral deposit. He conceded discovery on two oth-

---

11. The decision of the Secretary recognizes that the inferences arising from the circumstances of this case "are stronger than in most cases in which the Department has refused to accept these inferences", but holds that "it is the nature of the evidence and not its strength which is the determining criterion".

12. An additional test of marketability has been imposed by the Department with respect to widespread nonmetallic minerals, such as sand and gravel. In Coleman v. United States, supra, the court held that it was not necessary to show marketability in a claim for building stone; that no distinction should be made between a placer claim for gold and a placer claim for building stone with respect to proof of a valuable mineral; and that "[t]he prudent man test of Castle v. Womble should suffice for either". (363 F.2d at 202).

er claims by reason of the high mineralization.[13] The emphasis placed on the question of whether the "minerals exposed" would "stand the cost" of operating at a "commercial profit" is illustrated by the following excerpt from the examination of the Government geologist:

"Q (By Mr. Allan) To the best of your knowledge, was there any mineral exposed in any of these claims which would stand the cost of mining, transportation, and reduction at a commercial profit?

"MR. CARRELL: That is objected to on the ground that he answered that question and not material to the issues involved in this particular hearing.

"HEARING EXAMINER RAMPTON: It is not necessary to have a paying mine at the present time, and I am sure that Mr. Allan is aware of that. Do you have any—do you wish to state your purpose for asking that question?

"MR. ALLAN: Well, I am just laying the foundation here to show that there is no mineral exposed, is what my question was, which would stand the cost of mining transportation or reduction at a commercial profit.

"HEARING EXAMINER RAMPTON: And yet that is not the question we are called to determine here, to whether or not there is a paying mine at the present time.

"MR. ALLAN: I am asking whether or not there is a mineral exposed which would stand the cost of mining transportation and reduction at a commercial profit.

"HEARING EXAMINER RAMPTON: As a basis for laying a foundation, I don't think the question is objectionable, and with the understanding, of course, that I cannot make a ruling that the claims are invalid because they don't have paying or exposed—I am going to allow the witness to answer.

"THE WITNESS: No." (Tr. pp. 44–46.)

█ In my opinion the examiner correctly concluded that "there is an exposure of valuable mineralization sufficient to satisfy the requirements of the mining law as to discovery."

The Secretary draws a sharp distinction between "exploration" and "development".[14] The relationship between exploration and development with respect to discovery was considered by the Court of Appeals for the Ninth Circuit in two cases—Lange v. Robinson, 1906, 148 F. 799, and Charlton v. Kelly, 1907, 156 F. 433.

In the Lange case, the court said in pertinent part:

" * * * The question (of discovery) must be decided, not only with reference to the gold actually found within the limits of the claim located, but also in view of its situation with reference to other lands known to contain valuable deposits of placer gold, and wheth-

13. On the other hand, the witness Wright testified, "The fact that the values are low at the surface does not or cannot be ruled out as not being important in a situation such as we have here at Henault where there is other evidence of mineralization like hydrothermal alteration, zones that are mineralized with some quartz, pyrite and, maybe, $2 or $3, $5 a ton in gold in some instances." (P. 67, Tr. Testimony of Lawrence B. Wright).

14. The Secretary's decision reads in pertinent part:
"Exploration work is that which is done prior to discovery in an effort to determine whether the land contains valuable minerals. Where minerals are found it is often necessary to do further exploratory work to determine whether those minerals have value and, where the minerals are of low value, there must be more exploration work to determine whether those low-value minerals exist in such quantities that there is a reasonable prospect of success in developing a paying mine. It is only when the exploratory work shows this that it can be said that a prudent man would be justified in going ahead with his development work and that a discovery has been made." This statement was quoted with approval in Converse v. Udall, D.Or. 1966, 262 F.Supp. 583, 595. This case is now pending on appeal.

er its rock and soil formation are such as is usually found where these deposits exist in paying quantities * * *.

"* * * There was an actual discovery of gold upon each of the claims located. They are situated near other lands presenting the same surface indications, which at the date of the location of these claims were known to be valuable for the placer gold which they contained; and these facts, according to the uncontradicted testimony of the plaintiff and that of the witness Field, above quoted, were sufficient to justify the expenditure of money for the purpose of their exploration, with the reasonable expectation that, when developed, they would be found valuable as placer mining claims. This was in our opinion all that was necessary." (At 803 of 148 F.)

The same rule was followed in *Charlton* in approving an instruction given by the trial court which used the term "development". The court said in part:

"It is argued that a discovery sufficient to justify the expenditure of time and money in the development of a mining claim must necessarily be greater than that which is necessary to justify the expenditure of money for the purpose of exploration, with the reasonable expectation that, when developed, the claim will be found valuable as a placer mining claim. Counsel for the plaintiffs in error have assumed for the word 'development' a broad-

er meaning than was intended in the charge." [15]

The Secretary recognizes that the "recommended drilling program is not inexpensive", but concludes that "until the recommended exploratory steps are taken, there would appear to be no basis for determining whether a prudent man would be justified in expending money and effort with the reasonable expectation of developing a profitable mine". This goes beyond the test in Castle v. Womble as set forth in decisions of the Supreme Court and the Court of Appeals for the Ninth circuit. For example, in Cameron v. United States, supra, the Court held that the Secretary correctly proceeded upon the theory "that to support a mining location a discovery should be such as would justify a person of ordinary prudence in the further expenditure of his time and means in an effort to develop a paying mine".[16] The facts here established, accepted as true by the Secretary, would clearly justify the expenditure recommended by the witness Wright (whether it be termed "exploration" or "development") by a prudent man "in an effort to develop a paying mine" and "with the reasonable prospect of success in developing a valuable mine".

It is the conclusion of the court that the State Director did not make a prima facie case of "no discovery" and that the decision of the Secretary of the Interior invalidating the claims was based on an erroneous legal theory and is not in accordance with law.[17]

In view of my conclusion that the hearing examiner was correct in his conclu-

15. The Secretary and counsel for defendants distinguish *Lange* and *Charlton* on the ground that they involved disputes between rival locators. It is true that the rule respecting the sufficiency of a mineral deposit is more liberal in a contest between two claimants and less evidence of discovery is accepted, but I do not believe the rule set forth in *Lange* and *Charlton* may be disregarded on this basis.

16. See also Coleman v. United States, supra; Lange v. Robinson, supra; Charlton v. Kelly, supra.

17. Plaintiff concedes that the "examiner is a subordinate whose findings do not have the weight of the findings of a district judge", and his decision may be disregarded by the Secretary. 2 Davis, Administrative Law Treatise, Sec. 10.04, p. 26. As noted supra, however, the Secretary in effect has accepted the findings of the examiner, and the two motions for summary judgment present the legal question of whether under these findings the decision of the Secretary was proper.

482

sion that there was a valid discovery with respect to each of the 18 claims, it is unnecessary to consider plaintiff's contention that its proposed findings 10, 11 and 12 should have been adopted by the examiner.

The motion of the defendants for summary judgment is denied. The motion of plaintiff is granted, except as to the proposed findings. Pursuant to Rule 11(b) of the local rules of court, plaintiff will prepare, serve and lodge a judgment consistent with this opinion.